NOT RECOMMENDED FOR FULL TEXT PUBLICATION
File Name: 10a0727n.06

No. 09-4352

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

**FILED**

**Nov 18, 2010**

LEONARD GREEN, Clerk

WAYNE EDWARD GRUBB, )
                               )
    **Plaintiff-Appellant,** )
                                 ) **ON APPEAL FROM THE UNITED**
v. ) **STATES DISTRICT COURT FOR**
                                 ) **THE SOUTHERN DISTRICT OF**
YSK CORPORATION, ) **OHIO**
                                 )
    **Defendant-Appellee.** )

BEFORE: KEITH, KENNEDY, and COOK, Circuit Judges.

**KENNEDY, Circuit Judge.** Plaintiff Wayne Grubb appeals the grant of summary judgment in favor of his former employer, YSK Corporation, on his claims of Family and Medical Leave Act ("FMLA") retaliation and age discrimination. Grubb's FMLA retaliation claim was rejected when the district court concluded that Grubb could neither offer any direct evidence of discriminatory animus, nor demonstrate a causal connection between his use of FMLA leave and his termination through circumstantial evidence. The district court rejected plaintiff's age discrimination case because he had no direct evidence that age was a factor in his termination and could not establish that he was replaced by a younger employee, so was lacking any circumstantial evidence. For the reasons that follow, we AFFIRM.

## FACTUAL BACKGROUND

YSK manufactures and markets automotive parts. In June 1989, YSK employed Grubb to work in a supervisory capacity at its manufacturing plant in Chillicothe, Ohio. Grubb was an "at-will" employee, despite his testimony that various company officials had promised him employment

"for life." His final position prior to his termination in October 2006 was Shift Supervisor, alternating between the second and third shifts. He was 58 years old at the time of his termination.

During the first nine months of 2005, Grubb began experiencing pain in his legs, feet, hands, and back, which made it difficult for him to walk around the plant and perform his job duties. Grubb was diagnosed with rheumatoid arthritis and advised YSK's human resources of this diagnosis.

Toward the end of 2005, Grubb received an unfavorable performance evaluation from his direct supervisor, Kent Ziegler. The evaluation indicated that Grubb needed to do more and stay busier while on-duty. Following the evaluation, Grubb explained to Rick Harper, YSK's Plant Supervisor, that his pain was so severe that it prevented him from walking around the plant as much as his superiors required. Grubb asked Harper to be provided with one of the motorized carts the plant possessed to move around the facility. According to Grubb, Harper responded, "You're a liar. There's nothing wrong with you. You're just lazy. And if you don't walk eight hours a day, I'm going to deal with you." Grubb testified that he thought that Harper was unaware of his diagnosis of rheumatoid arthritis at the time that Harper denied him use of a motorized cart. Harper denies any recollection of this conversation. Grubb claims that because Harper refused to accommodate his disability, he needed to request medical leave.

Grubb's request for medical leave from YSK pursuant to the FMLA was granted, and the company paid him in full during his absence. While in treatment, professionals discovered that Grubb also had two slipped vertebrae that pinched a nerve. Following his successful treatment, on January 15, 2006 Grubb returned to work without any medical restrictions and was again able to

perform all of his essential job duties. Thereafter, he received a performance evaluation from Ziegler which was favorable overall. The evaluation was approved by Harper.

On the night of June 21, 2006, while supervising the third shift, Grubb permitted some third shift employees to leave prior to the conclusion of their shift. The following day, Grubb received an email from First Shift Supervisor Rob Detillion questioning why Grubb had permitted the employees to depart early when Detillion believed that there was work that they could have performed, but was left for a subsequent shift. Detillion's supervisor, Mike Snyder, and Grubb's supervisor, Ziegler, were carbon copied on the email.

Grubb objected to Detillion's decision to carbon copy their respective supervisors on the email. Consequently, in response to the email, Grubb attempted to place a telephone call on his cellular telephone to Detillion to discuss the matter and, when poor signal coverage made conversation impossible, asked an hourly employee, Robert Manbevers, on Grubb's shift to be present while he called Detillion on a YSK speakerphone to discuss the matter. After reaching Detillion, Grubb informed Detillion that Manbevers was present. Though the exact words used during the phone call are disputed, the gist of the conversation was that Grubb disagreed with Detillion's decision to send an email copied to their superiors detailing his concerns about Grubb's decision to allow the early departure of the third shift employees the prior night. Grubb admits to telling Detillion:

> [Y]ou don't have to be a dickhead by sending the e-mails out to everyone. You know how those guys can be and they will twist a little bit of information to make it look like I'm not doing my job. How would you like it if I started doing the same thing to you, sending e-mails to everyone every time I thought you hadn't done everything the way I thought it should have

3

> been done. Just try to be more professional and contact me directly to get issues like this resolved.

Also undisputed is that following the conclusion of the conversation between Grubb and Detillion, Grubb told Manbevers that Detillion "was being a little dickhead and would think twice before doing that again." Unbeknownst to Grubb, Detillion was still on the open telephone line when he made that statement. Another subordinate, Rex Newlan, gave the employer a statement indicating Grubb said to him "Rob was just being a dickhead, and I had to teach him a lesson to quit doing that. I called him on it. I called him up and said don't act like a dickhead." Grubb also related the substance of the conversation to his supervisor, Ziegler.

Ziegler investigated the incident on or about June 28, 2006, after returning from a vacation. Pursuant to this investigation, after speaking to Detillion on June 28, 2006, Ziegler requested a written memorandum detailing the events that had transpired. Among other things, Detillion reported that, after the telephone conversation with Grubb and while he was still on the phone, Detillion overheard Grubb tell Manbevers and several other individuals who had entered the production office that Detillion "was being a little dick head" and "would think twice before doing that again." Ziegler also interviewed Manbevers and Newlan. Manbevers reported that: (1) Grubb asked him to be present for the call to Detillion; (2) Grubb tried to get Detillion to say something bad about Manbevers; (3) Detillion was very professional during the call; (4) Grubb cursed at Detillion and told Detillion that he should never go over Grubb's head again and Grubb would teach him the chain of command; (5) after the call, Grubb told Manbevers how stupid Detillion was and said he would teach Detillion a lesson; and (6) Manbevers felt out of place, uncomfortable, and thought that

it was unprofessional for Grubb to have involved him. Newlan reported that: (1) Grubb told him about his call to Detillion and how he had Manbevers present to listen; (2) Grubb said that he taught Detillion a lesson for going over his head by copying others on an email and that if Detillion acted similarly in the future, he would "make him pay"; (3) Newlan was worried that Grubb would bully him if Grubb knew that Newlan spoke with Ziegler; and (4) Newlan did not feel that what Grubb did was proper. Ziegler subsequently prepared a memorandum to YSK's Human Resources Manager, Linda Shimp, compiling the results of his interviews and investigation of the incident.

During July 2006, Ziegler, Shimp, and the General Manager of YSK, Earl Fletcher, examined and discussed the complied documentation and concluded that Grubb's behavior–especially in light of his supervisory position–was inappropriate, threatening, harassing, and in violation of YSK's Standards of Conduct as memorialized in company handbooks.[1] During the investigation, Detillion reported to Shimp that he did not feel personally threatened by Grubb. In mid- to late-July 2006, those same three individuals recommended to YSK's Board of Directors that Grubb's employment be terminated on July 31, 2006 unless, after they met with Grubb, he was able to rebut the evidence.

However, on July 29, 2006, Grubb suffered a heart attack and took an immediate leave of absence from YSK. Shimp approved his medical leave and no further action towards implementing Grubb's termination was taken. In mid-August 2006, Grubb exhausted his statutorily-allotted twelve weeks of FMLA leave and was notified of that fact by a letter from Shimp. However, YSK permitted Grubb to remain on fully paid medical leave for the balance of his recovery.

---

[1]Grubb acknowledged receipt of several of these Associate Handbooks during his employment and was aware of their contents.

Grubb returned to YSK free of any medical restrictions in early October 2006. On October 2, 2006, Grubb met with Ziegler, Shimp, and Fletcher regarding his misconduct the preceding June. When he failed to refute the evidence gathered against him, they told him that he would be terminated pending the conclusion of the investigation.

Frederick McFann, YSK's Senior Manager of Engineering, testified that shortly after Grubb met with Ziegler, Shimp, and Fletcher and they informed him of his impending termination, Harper pulled McFann out of a meeting, walked him outside, and asked him his opinion of Grubb. McFann testified that during that conversation, Harper told him that YSK could have terminated Grubb for taking too much leave pursuant to the FMLA, but that he was not involved in the investigation or termination decision.

Michael Duffy, YSK's Senior Manager of Sales, testified that during dinner with Grubb on October 6, 2006, he overheard a telephone call between Grubb and Shimp where Shimp told Grubb that the investigation would be extended an additional week because Harper was not going to be involved in it. Harper testified that he was not involved in the decision to terminate Grubb. Shimp swore in a signed affidavit that Harper did not participate in the decision to terminate Grubb's employment. However, Grubb testified that in general, no decisions were made at the YSK plant without Harper's knowledge and/or input.

Grubb was terminated via a letter dated October 13, 2006.

Following Grubb's termination, Toni Cooper, a Second Shift Supervisor, absorbed Grubb's former responsibilities for at least six months by working a split shift which overlapped both the second and third shifts. McFann testified that Gary Shaffen subsequently became the Third Shift

6

Supervisor. No evidence was offered as to Cooper's or Shaffen's ages. Grubb testified that an individual named J.L. Campbell eventually assumed his responsibilities. Grubb believed that Campbell was approximately 40 years old when he took over the position.

Duffy testified that at a meeting in April 2007, Seith Tokairin, the President of YSK, stated in regard to employee turnover, "Well, that's not too bad, at least we got rid of the old people." This statement was spoken in Japanese and translated into English at the meeting.

Grubb filed a complaint containing federal and state law claims against YSK in the Common Pleas Court, Ross County, Ohio on December 7, 2007. YSK removed the action to the U.S. District Court for the Southern District of Ohio on January 4, 2008. Following the completion of discovery, YSK filed a motion for summary judgment on December 1, 2008, which was duly opposed by Grubb. The district court considered this motion with respect to Grubb's federal law claims only, granted the motion, and remanded Grubb's state law claims to the Ohio courts. Grubb appeals.

**STANDARD OF REVIEW**

We review a district court's grant of summary judgment *de novo*. *Allen v. Highlands Hosp. Corp.*, 545 F.3d 387, 393 (6th Cir. 2008). Summary judgment is proper "if the pleadings, the discovery and disclosure materials on file and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c). We must draw all reasonable inferences in favor of Grubb, the nonmoving party. *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Crawford v. TRW Auto. U.S. LLC*, 560 F.3d 607, 611 (6th Cir. 2009).

**DISCUSSION**

**I. FMLA Retaliation**

The FMLA entitles an "eligible employee" to up to twelve weeks of leave per year if he or she has a "serious health condition" that prevents the employee from performing the functions of his or her job. 29 U.S.C. § 2612(a)(1)(D); *Walton v. Ford Motor Co.*, 424 F.3d 481, 485 (6th Cir. 2005). Employees who utilizes FMLA leave are entitled to be restored to their positions, or an equivalent one, upon their return. 29 U.S.C. § 2614(a)(1). However, an employee who remains "unable to perform an essential function of the position" once his or her FMLA leave ends is not entitled to restoration or another position. 29 C.F.R. § 825.216(c). An employer may not discriminate or retaliate against an employee for taking FMLA leave. 29 U.S.C. § 2615(a)(2). In particular, an employer is prohibited from "us[ing] the taking of FMLA leave as a negative factor in employment actions." 29 C.F.R. § 825.220(c); *Arban v. West Publ'g Corp.*, 345 F.3d 390, 403 (6th Cir. 2003). Grubb alleges that YSK terminated him as retaliation for his having taken FMLA leave to treat his back problems and following his heart attack.

Plaintiffs claiming FMLA retaliation may prove their cases using either direct or circumstantial evidence. "'[D]irect evidence of discrimination does not require a factfinder to draw any inferences in order to conclude that the challenged employment action was motivated at least in part by prejudice against members of the protected group.'" *DiCarlo v. Potter*, 358 F.3d 408, 415 (6th Cir. 2004) (quoting *Johnson v. Kroger Co.*, 319 F.3d 858, 865 (6th Cir. 2003)). "'The evidence must establish not only that the plaintiff's employer was predisposed to discriminate . . . but also that the employer acted on that predisposition.'" *Id.* (quoting *Hein v. All America Plywood Co.*, 232 F.3d

482, 488 (6th Cir. 2000)). "Evidence of discrimination is not considered direct evidence unless a[n improper] motivation is explicitly expressed." *Amini v. Oberlin Coll.*, 440 F.3d 350, 359 (6th Cir. 2006). Conversely, when a plaintiff seeks to prove FMLA retaliation using circumstantial evidence, the employee's "burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action 'under circumstances which give rise to an inference of unlawful discrimination.'" *Macy v. Hopkins Cnty. Sch. Bd. of Educ.*, 484 F.3d 357, 364 (6th Cir. 2007) (quoting *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981)).

We consider Grubb's FMLA retaliation claim under the familiar burden-shifting framework announced in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *Bryson v. Regis Corp.*, 498 F.3d 561, 570 (6th Cir. 2007).[2] In this context, "a plaintiff must typically make a prima facie showing that: (1) he engaged in a statutorily protected activity; (2) he suffered an adverse employment action; and (3) a causal connection exists between the protected activity and the adverse employment action." *Daugherty v. Sajar Plastics, Inc.*, 544 F.3d 696, 707 (6th Cir. 2008). Grubb has satisfied the first two prongs of this test. He had taken FMLA leave, a protected activity, and was terminated from YSK, an adverse employment action. The dispute centers only on whether a causal connection existed between the protected activity and the adverse employment action.

---

[2]As we noted in *Hunter v. Valley View Local Schools*, 579 F.3d 688, 692 n.2 (6th Cir. 2009), the standard applicable to employment discrimination claims "depends not on the type of evidence presented (direct versus circumstantial), but on the type of claim brought (single-motive versus mixed-motive)." Though we have modified the summary judgment standard applicable to mixed-motive Title VII claims, *White v. Baxter Healthcare Corp.*, 533 F.3d 381, 400 (6th Cir. 2008), we need not decide whether *White* applies to an FMLA retaliation case because of Grubb's failure to present any admissible and material evidence in support of a causal connection between his use of FMLA leave and his termination from YSK.

Grubb proffers several pieces of admissible[3] circumstantial[4] evidence to support his theory

that Harper possessed a discriminatory animus towards him on the basis of his use of FMLA leave

and that YSK terminated him on the basis of this animus:

---

[3]Grubb also proffers Duffy's testimony that McFann told him that Harper had told McFann that he was "not involved anymore" in the investigation into Grubb's misconduct, "but, you know, he took too much FMLA," as admissible evidence. We concur with the district court that this testimony is inadmissible hearsay and therefore cannot be considered on a motion for summary judgment. *See Wiley v. United States*, 20 F.3d 222, 225-26 (6th Cir. 1994). Though Grubb primarily offers the declarations for the truth of the matter asserted–namely, to prove that Harper's statement that he was "not involved anymore" means he previously was involved in the misconduct investigation–he argues that both Harper's and McFann's statements are exempted from the hearsay rule as admissions by a party opponent. *See* Fed. R. Evid. 801(d)(2)(D) ("A statement is not hearsay if . . . [t]he statement is offered against a party and is . . . a statement by the party's agent or servant concerning a matter within the scope of the agency or employment, made during the existence of the relationship."). Harper's statements to McFann do qualify as admissions by YSK because they were made by its employee, Harper, and they concerned a matter within the scope of Harper's employment, an ongoing misconduct investigation of one of Harper's subordinates. However, McFann's statements cannot be considered admissions by YSK because McFann's retelling of Harper's remarks to Duffy is not within the scope of McFann's employment. Therefore, Duffy's testimony is inadmissible. *See United States v. Gibson*, 409 F.3d 325, 337 (6th Cir. 2005) ("[I]n order for double-hearsay statements to be admissible, both statements must be excluded from the hearsay definition." (explaining holding of *Estate of Shafer v. Comm'r*, 749 F.2d 1216, 1220 (6th Cir. 1984))).

[4]Grubb claims that one piece of admissible evidence is direct evidence of Harper's discriminatory animus: McFann's testimony that Harper told him that YSK could have terminated Grubb for using too much FMLA leave, but that Harper was not involved in the investigation or termination decision. This evidence does not permit a factfinder to conclude that Grubb's termination was motivated at least in part by prejudice against him for use of FMLA leave without inferring that Harper possessed an impermissible animus against Grubb and that YSK terminated Grubb because of this animus. Consequently, Grubb is mistaken that this piece of evidence is direct evidence.

1.  McFann's testimony that Harper told him that YSK could have terminated Grubb for using too much FMLA leave, but that Harper was not involved in the investigation or termination decision;

2.  Duffy's testimony that he heard Shimp say "Rick Harper was not going to be involved in [the investigation]";

3.  Grubb's testimony that in October 2005, before he asked to take FMLA leave, Harper called him a liar, lazy, and refused to provide him with a motorized cart to get around the YSK plant;

4.  testimony from Bart Rovins, a former YSK plant manager, that he was involved in termination decisions when he was employed by YSK;[5]

5.  affidavits of various YSK employees claiming that "shop talk" was common at the plant.

Even construing the evidence in the light most favorable to Grubb, none of this evidence is legally sufficient to establish a causal connection between the protected activity and the adverse employment action.

McFann's testimony and Duffy's admissible testimony relate to the same topic–Harper's involvement in the investigation into Grubb's June 2006 misconduct and his subsequent termination. Both pieces of testimony state Harper was not involved. Grubb argues that these statements mean the precise opposite–that when Harper claimed he was not involved, that meant that he was involved because he commented on the subject at all. There is no evidence in support of this illogical inference and we are not obliged to draw unreasonable inferences in Grubb's favor. *See Scott v.*

---

[5]We declined to discuss Rovins's testimony in the Statement of Facts because it is immaterial, as will be discussed, *infra*.

11

*Harris*, 550 U.S. 372, 381 n.8 (2007) (noting that on summary judgment, courts are compelled to draw all inferences in favor of the nonmoving party "*to the extent supportable by the record*").

Similarly, McFann's testimony that Harper told him that Grubb had exhausted his FMLA leave and could have been terminated because of that is an accurate statement of the statutory grounds for termination of employees who are unable to return to work and have exhausted their medical leave. We have previously held that "an employer does not violate the FMLA when it fires an employee who is indisputably unable to return to work at the conclusion of the 12-week period of statutory leave." *Edgar v. JAC Prods., Inc.*, 443 F.3d 501, 506-07 (6th Cir. 2006). Harper's alleged statement, which was objectively true, does not provide evidence of a causal connection between Grubb's use of FMLA leave and his termination. Moreover, even making all inferences in Grubb's favor, we cannot infer that because Harper allegedly said "we could have let him go for using too much FMLA," the "we" meant that Harper was involved in Grubb's termination rather than its plain meaning that "we" meant YSK.

Harper's alleged accusation in 2005 that Grubb was lazy and a liar about his back problems does not support the conclusion that there was a causal connection between Grubb's use of FMLA leave and his subsequent termination in 2006. Harper allegedly made these comments when Grubb asked for a motorized vehicle to get around the plant, prior to when he asked to take the earlier FMLA leave. Grubb testified that when Harper was dismissive of Grubb's back pain, he believed that Harper was unaware of his rheumatoid arthritis diagnosis. While it is entirely possible that Harper was skeptical of Grubb's need–especially without knowledge of his diagnosis–and believed him to be malingering, such opinions are unrelated to any opinions that Harper may have had about

12

Grubb's subsequent decision to take medical leave because of his heart attack, and do not establish that YSK had a discriminatory animus towards Grubb for having taken that medical leave.

Rovins testified that when he was YSK's Human Resource Manager and then Plant Manager, he was generally involved in all disciplinary actions. The district court correctly disregarded this testimony as legally insufficient to establish a causal connection between Grubb's use of FMLA leave and his termination. First, Rovins had no personal knowledge of the events surrounding Grubb's termination–he was no longer employed by YSK at the time and had not been employed by YSK since February 2000. Second, the record does not support the inference that because Rovins was involved in termination decisions when he was plant manager, that means that Harper was involved in Grubb's termination, especially given the lapse of time, the extensive evidence to the contrary, and the fact that Harper, unlike Rovins, was never YSK's Human Resources Manager.

Similarly, the affidavits of Bart McCoy, Paul Griesheimer, Greg Robinson, and Rovins provide no evidence supporting a causal connection between Grubb's decision to take FMLA leave and his termination. In their affidavits, all of these individuals describe a "shop talk" atmosphere at YSK where vulgar language was not uncommon, state that they were unaware of other associates being terminated for similar misconduct, and opine that Grubb ought not to have been terminated for his misconduct. Grubb argues that this evidence supports his theory that his June 2006 misconduct was a pretext for his termination. However, just as it would be inappropriate for a court to consider an employer's proffered nondiscriminatory reason for taking an adverse employment action when analyzing a plaintiff's prima facie case, it is improper for Grubb to attempt to prove that

YSK's actions were pretextual prior to establishing a causal connection between his use of FMLA leave and his termination. *See Wexler v. White's Fine Furniture*, 317 F.3d 564, 574 (6th Cir. 2003).

In addition to Grubb's proffered circumstantial evidence discussed above, he points to the alleged temporal proximity between his use of FMLA leave and his termination to support the inference that there was a causal connection between the two. "[T]his Circuit has embraced the premise that in certain distinct cases where the temporal proximity between the protected activity and the adverse employment action is acutely near in time, that close proximity is deemed indirect evidence such as to permit an inference of retaliation to arise." *DiCarlo*, 358 F.3d at 421. The parties dispute when the decision to terminate Grubb was made. Grubb argues that it occurred in October 2006, contemporaneously with the termination itself. YSK contends that the decision was made in July 2006, directly before Grubb suffered his heart attack.

Grubb's only evidence in support of his assertion that the termination decision was made in October 2006 is Shimp's alleged statement to Grubb that the investigation would be continued for a week without input from Harper. However, because Grubb was informed of his termination immediately upon his return to YSK following his recovery from his heart attack, the decision had clearly already been made–he was simply afforded an opportunity to rebut the evidence arrayed against him. Consequently, even construing the evidence in the light most favorable to Grubb, we agree with the district court that the decision to terminate Grubb was made in July 2006 and was not, therefore, temporally proximate to Grubb's use of FMLA leave for recovery from his heart attack because it preceded that leave.

Having considered all of Grubb's proffered evidence and legal arguments, we agree with the district court that he fails to establish a causal connection between his use of FMLA leave and his termination. Consequently, he fails to establish a prima facie case of FMLA retaliation and summary judgment on this clam was appropriate.

## II. Age Discrimination

Grubb alleges that YSK violated the Age Discrimination in Employment Act ("ADEA") when it terminated his employment. YSK asserts that Grubb cannot establish a prima facie case of age discrimination because he cannot demonstrate that he was replaced by a younger employee.

The ADEA prohibits an employer from discharging older employees on the basis of their age. 29 U.S.C. § 623(a); *Wexler*, 317 F.3d at 570. An employee may establish a claim under the ADEA by offering either direct or circumstantial evidence of age discrimination. *Wexler*, 317 F.3d at 570. In *Gross v. FBL Financial Services, Inc.*, the Supreme Court emphasized that under the ADEA, the burden of persuasion remains on plaintiffs to demonstrate "that age was the 'but-for' cause of their employer's adverse action." 129 S. Ct. 2343, 2351 n. 4 (2009). As is the case with an FMLA retaliation claim, generally, at the summary judgment stage, a plaintiff's burden is merely to present evidence from which a reasonable jury could conclude that the plaintiff suffered an adverse employment action "under circumstances which give rise to an inference of unlawful discrimination." *Burdine*, 450 U.S. at 253. Grubb testified that no member of management made any discriminatory age-related remarks to him or about him and therefore attempts to establish his case using only circumstantial evidence. Consequently, he must establish: "1) that he was a member of a protected class; 2) that he was discharged; 3) that he was qualified for the position held; and 4)

that he was replaced by someone outside of the protected class." *Geiger v. Tower Auto.*, 579 F.3d 614, 622 (6th Cir. 2009). As in the FMLA retaliation context, the employer's alleged nondiscriminatory reason for taking an adverse employment action may not be considered by a court when analyzing the prima facie case. *See Wexler*, 317 F.3d at 574.

Grubb was 58 years old at the time of termination and therefore was a member of a protected class of employees over 40 years of age. Though Grubb received a negative performance review prior to his FMLA leave to treat his back ailments, he received a positive review after his return in January 2006, suggesting that he was qualified for the position. Therefore, viewing the facts in the light most favorable to Grubb, he meets the first three requirements for establishing a prima facie case. At issue is whether Grubb has shown sufficient circumstantial evidence to satisfy the fourth element by introducing evidence that he was replaced by someone "substantially younger." YSK claims that for at least six months after Grubb's termination, it redistributed Grubb's supervisory responsibilities to Toni Cooper. Grubb's brief states that YSK assigned his former duties and job to Cooper, J.L. Campbell, and then later to Gary Shaffen. However, in his deposition, Grubb stated he did not know who replaced him, but he believed that Campbell eventually took over his position. Grubb also cites to McFann's deposition in which McFann denies that Shaffen replaced Grubb and asserted that Cooper carried the Second and Third Shift Supervisor duties. This is the sum and substance of Grubb's evidence of age discrimination.[6]

---

[6]We note that Duffy testified that at a meeting in April 2007, Seith Tokairin, the President of YSK stated, "[w]ell, that's not too bad, at least we got rid of the old people" when discussing employee turnover. This statement was translated to English from Japanese and made six months after Grubb's termination. Standing alone, it does not evidence a pattern or practice of age

The uncontested evidence establishes that Cooper, who was already supervising the second shift, absorbed Grubb's duties for at least six months after his termination. Missing in Grubb's assertions are any facts establishing that Cooper or Campbell were substantially younger than Grubb. Specifically, Grubb testified during his deposition that he believed Campbell to be around 40, but that he "may be wrong." Neither party has introduced evidence regarding Cooper's age. Consequently, on the basis of the proffered evidence, Grubb has failed to sustain his burden to establish his prima facie case of age discrimination because he has not offered facts demonstrating that he was replaced by someone outside the protected class.

Because Grubb has neither offered any evidence that he was replaced by someone substantially younger, nor any evidence of the alleged replacements' ages or any other evidence regarding age discrimination, he fails to establish a prima facie case of age discrimination[7] and the district court correctly granted summary judgment on this claim.

---

discrimination. A "[p]laintiff may not establish a *prima facie* case of age discrimination based on vague, ambiguous, or isolated remarks." *DiCarlo*, 358 F.3d at 422 (Kennedy, J., concurring in part and dissenting in part). Moreover, Grubb's reliance on YSK's admission that other individuals over 40 years of age were terminated for misconduct does not show a pattern or practice of discrimination by itself and does nothing to establish that Grubb was replaced by a significantly younger employee. We note that although a plaintiff can satisfy the fourth prong of the prima facie case by showing that he "was treated differently from similarly situated employees outside the protected class," *Mitchell v. Vanderbilt Univ.*, 389 F.3d 177, 181 (6th Cir. 2004), Grubb testified that he did not allege that younger associates at YSK were treated more favorably than he was.

[7]Grubb criticizes the district court for not considering the affidavits of McCoy, Robison, Rovins, and Griesheimer in evaluating his age discrimination claim. These affidavits were properly disregarded in relation to Grubb's ADEA claim for the same reasons they were irrelevant to Grubb's claim of FMLA retaliation.

## CONCLUSION

Because the district court correctly granted summary judgment on Grubb's FMLA retaliation and age discrimination claims, it was within its right to remand Grubb's state-law claims to the Ohio courts. Consequently, we AFFIRM.