RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 16a0240p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

———————————

ERIN O'DONNELL; WILFREDO DIAZ; CHRISTOPHER EREG; MICHAEL FARLEY; CYNTHIA MOORE; MICHAEL RINKUS; WILLIAM SALUPO; BRIAN SABOLIK; SCOTT SISTEK,

        *Plaintiffs-Appellants,*

    *v.*

CITY OF CLEVELAND, et al.,

        *Defendants-Appellees.*

No. 15-4398

———————————

Appeal from the United States District Court
for the Northern District of Ohio at Cleveland.
No. 1:14-cv-02612—James S. Gwin, District Judge.

Argued: August 3, 2016

Decided and Filed: September 23, 2016

Before: SUTTON, GRIFFIN, and DONALD, Circuit Judges.

———————————

## COUNSEL

**ARGUED:** Jonathan E. Rosenbaum, Elyria, Ohio, for Appellants. Aikaterini Houston, CITY OF CLEVELAND, Cleveland, Ohio, for Appellees. **ON BRIEF:** Jonathan E. Rosenbaum, Elyria, Ohio, for Appellants. Aikaterini Houston, CITY OF CLEVELAND, Cleveland, Ohio, for Appellees.

———————————

## OPINION

———————————

BERNICE BOUIE DONALD, Circuit Judge. In November 2012, thirteen police officers—twelve Caucasian and one Hispanic—engaged in a high-speed car chase in Cleveland,

1

Ohio. When the car finally came to a stop, the officers fired 139 bullets into the vehicle, killing the two African American suspects inside. The public outcry was deafening; the event's racial underpinnings spawned extensive media coverage, and the community demanded resignations and answers. The officers involved in the traumatic incident were subsequently assigned to restricted duty pursuant to departmental policy. Nine of those officers are the Plaintiffs in this case. The Plaintiffs assert that, as a result of the racial implications and community response to this particular deadly force incident, they were assigned to restricted duty for a longer period of time than their African American colleagues who have also been involved in deadly force incidents with African American suspects.

United States Supreme Court Justice Thurgood Marshall once wrote, "History teaches that grave threats to liberty often come in times of urgency, when constitutional rights seem too extravagant to endure." *Skinner v. Railway Labor Executives' Ass'n*, 489 U.S. 602, 635 (1989) (Marshall, J., dissenting). The Plaintiffs essentially claim that in a time of urgency, the City of Cleveland determined that the Plaintiffs' liberties were too extravagant to endure. While we should heed history's lesson about protecting civil liberties in times of crisis, history alone is not evidence of civil rights violations. Plaintiffs must still meet minimum requirements under the law to survive summary judgment. *See Zambetti v. Cuyahoga Cmty. College*, 314 F.3d 249, 255–56 (6th Cir. 2002) (articulating the modified *McDonnell Douglas* standard). Because the Plaintiffs have not met those requirements, we **AFFIRM** the district court's grant of summary judgment in favor of the Defendants.

**I.**

**A. The Traumatic Event**

On November 29, 2012, a vehicle sped by Cleveland Police Officers Vasile Nan and Alan Almeida and emitted a loud bang. Thinking that it was a gunshot, the officers and members of the public took cover as the vehicle continued along the highway. Officer Nan attempted to ascertain the vehicle's location, radioed the events to his dispatcher, and indicated that he was shot at by two African American men in a vehicle.

Shortly after this encounter, and the radio dispatch, nearby officers began to respond to the dispatcher's call. Two officers attempted a traffic stop of the vehicle, but it did not stop. The subsequent pursuit lasted about twenty-five minutes, reached speeds of over 100 miles per hour, involved 62 marked and unmarked police vehicles from numerous governmental entities, and ended in a middle school parking lot. With the suspects' car finally contained, Officer Wilfredo Diaz exited his vehicle and instructed the driver to "stop." Diaz believed he saw the passenger reach for a gun. In response, Diaz fired his weapon at the vehicle and its occupants multiple times. The suspects' vehicle then accelerated towards Diaz, and he continued to discharge his weapon. Other officers correspondingly discharged their weapons. In total, thirteen officers fired 139 shots at and into the vehicle. Its occupants, Timothy Russell and Malissa Williams, were killed in the barrage of shots.

**B. The Aftermath**

The East Cleveland Police Department took responsibility for the initial investigation, but the Ohio Bureau of Criminal Investigation ("BCI") eventually became the lead investigative body. The media started reporting the story, framing it as twelve Caucasian officers and one Hispanic officer shooting and killing two unarmed African American suspects after a high-speed car chase. The community response was significant, and several people sought Chief of Police Michael McGrath's and Director of Public Safety Martin Flask's resignation, as well as those of the officers involved.

After the shooting, the officer Plaintiffs—Erin O'Donnell, Diaz, Christopher Ereg, Michael Farley, Cynthia Moore, Michael Rinkus, William Salupo, Brian Sabolik, and Scott Sistek—were subject to the City of Cleveland's police department policy entitled Post Traumatic Incident Protocol ("PTIP"). The PTIP requires officers involved in deadly force incidents to be assigned to restricted duty status, which is colloquially referred to as being assigned to the "Gymnasium." Officers are assigned to the Gymnasium for a period of forty-five days by default to "facilitate" return to full duty as healthy, productive employees." R. 54-13, PageID #666–68. Being assigned to restricted duty limits an officer's contact with the public and prevents him from earning overtime pay, earning pay for court appearances, and engaging in outside employment. It also can cause stress and has been characterized as a "demeaning

process," as "an officer who entered law enforcement to provide a service to the citizens of a community is given a do-nothing assignment that provides no value to the citizens who the officers took an oath to serve." R. 54-22, PageID #724.

Once the forty-five day period is over, the PTIP allows the Chief of Police to extend the period "[a]t the request of the [officer] and/or the recommendation of the Division's Stress Consultant." R. 54-13, #667. To return to full duty, the officer must be cleared by the Division's Stress Consultant, an outside mental health professional, as well as the Medical Director. After an officer is cleared to return to full duty, the Chief of Police then has the discretion to determine the officer's assignment, "which may consist of a detail to a transitional non-sensitive position for up to 90 days." *Id.* The PTIP indicates that each incident will be reviewed individually.

Police Chief McGrath assigned the Plaintiffs to restricted duty on December 3, 2012, in compliance with the forty-five-day cooling-off period. On February 5, 2013, the BCI released its report to the county prosecutor, who then began his review. Before the county prosecutor finished his review, on June 3, 2013, McGrath issued a written order, indicating that the Plaintiffs were to return to full duty (except Rinkus, who returned to full duty on July 1, 2013). At the same time, he asserts that he issued a verbal instruction to his command staff that the Plaintiffs were to only be assigned non-sensitive positions, or transitional duties. In October 2013, McGrath discovered that the Plaintiffs had returned to full duty, in violation of his verbal instructions. When he discovered this error, McGrath once again ordered the Plaintiffs assigned to traditional duty. In May 2014, the state grand jury declined to issue criminal charges against any of the Plaintiffs, and on June 13, 2014, the new Police Chief, Calvin Williams, ordered the Plaintiffs to return to full duty.

## C. The Court Case

The Plaintiffs filed suit against the City of Cleveland, Michael McGrath (both in his individual and official capacities), Martin Flask (both in his individual and official capacities), Calvin Williams (both in his individual and official capacities), and Frank G. Jackson (in his official capacity) (collectively, the "Defendants") on November 28, 2014. Count I of the

Complaint alleges that the Defendants discriminated against the Plaintiffs in violation of 42 U.S.C. § 1981, 42 U.S.C. § 2000e-2 (Title VII of the Civil Rights Act), and Ohio Rev. Code § 4112.02(A). Count II alleges a violation of constitutional rights pursuant to 42 U.S.C. § 1983. Finally, Count III alleges a breach of contract claim. The Plaintiffs' theory of the case was that there was a policy in place that addressed officers involved in traumatic events. That policy, they assert, was to relegate those officers to the Gymnasium for a set period of time—namely, forty-five days. The Plaintiffs contend that McGrath relegated them to the Gymnasium and/or restricted duty for a longer period of time than established in policy because they were Caucasian officers involved in a traumatic event with African American suspects, which caused political problems for the mayor, the safety director, and the chief of police. The district court ultimately granted summary judgment in favor of the Defendants.

On appeal, the Plaintiffs assert numerous arguments.[1] They claim that the district court failed to properly construe facts in their favor in violation of the summary judgment standard; that the district court erred in granting the Defendants' summary judgment on the state law discrimination claim; that the district court erred in dismissing and denying their 42 U.S.C. §§ 1981 and 1983 claims; and that the district court erred in dismissing the Plaintiffs' breach of contract claim for failure to exhaust contractual remedies. We review each in turn.

## II.

First, the Plaintiffs claim that the district court wrongfully construed two facts in favor of the Defendants, in violation of the summary judgment standard.[2] "In ruling upon a Rule 56 motion, 'a District Court must resolve any factual issues of controversy in favor of the non-moving party' only in the sense that, where the facts specifically averred by that party contradict facts specifically averred by the movant, the motion must be denied." *Lujan v. Nat'l Wildlife Fed.*, 497 U.S. 871, 888 (1990). Further, "a mere 'scintilla' of evidence in support of the non-moving party's position is insufficient to defeat summary judgment; rather, the non-moving

---

[1]At oral argument, the Plaintiffs waived their argument that the district court abused its discretion in denying the Plaintiffs' request for a discovery extension.

[2]The Plaintiffs also argue that the district court improperly concluded that two prior court cases regarding discrimination against Caucasians in the Cleveland police department were not similar to the situation at issue here. For the reasons stated in Section III, the district court did not err.

party must present evidence upon which a reasonable jury could find in her favor." *Tingle v. Arbors at Hilliard*, 692 F.3d 523, 529 (6th Cir. 2012) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251 (1986)).

The Plaintiffs take issue with the district court's characterization of Russell and Williams as "unarmed" as well as the district court's indication that "[a] backfiring car engine likely caused the noise" that resembled "a gunshot type sound." Br. 32. The Plaintiffs claim that the Ohio Bureau of Criminal Investigation's Report ("BCI Report") and the Consulting Report from Police Trainer and Consultant W. Ken Katsaris contradict the district court's characterization. The BCI Report concludes that "[n]o scientific conclusion can therefore be made from these results as to whether or not either of the subjects had recently possessed or fired a weapon." R. 54-1, PageID #530. Further, the Consulting Report indicated that "it was not a stretch to arrive at the reasonable perception [that Russell and Williams] were, indeed, shooting at the officers or planning and preparing to shoot at various points during the course of the reckless evading of the officers." R. 54, PageID #664. Thus, the Plaintiffs argue that the district court should have concluded, for summary judgment purposes, that Russell and Williams were "two drug addicted mentally unstable fleeing felons shooting at police officers while driving around at high speeds endangering the populace." Br. 34.

In its characterization of the events of November 29, 2015, the district court construed the absence of evidence to the contrary to suggest that Russell and Williams were likely unarmed and that the gunshot-type noise was likely Russell and Williams' car backfiring. The Plaintiffs have not offered a scintilla of evidence that suggests that the noise was actually a gunshot. They also have not cited any evidence in the record that suggests that Russell and Williams were actually armed. Indeed, the evidence they cite suggests that the investigation revealed *no* such evidence. Thus, the district court did not err in making these two inferences.

However, even if it were error for the district court to make those inferences, the characterization does not constitute a genuine dispute of *material* facts. *See* Fed. R. Civ. P. 56. The Plaintiffs' main claim is that they, as Caucasian police officers, were treated differently than African American police officers after a deadly force incident involving an African American suspect. That claim does not turn on whether Russell and Williams were actually armed or

whether they were actually shooting at officers.  Further, whether Russell and Williams were actually armed does not affect any prong of the modified *McDonnell Douglas* standard.  Accordingly, even if it was erroneous for the district court to phrase the facts as it did, any error was harmless.

**III.**

Second, the Plaintiffs claim that the district court erred in granting summary judgment in favor of the Defendants on the Plaintiffs' Ohio Revised Code § 4112.02 discrimination claim.  This Court reviews a district court's grant of summary judgment de novo.  *Troche v. Crabtree*, 814 F.3d 795, 798 (6th Cir. 2016).  A movant is entitled to summary judgment only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a).  This Court draws all reasonable inferences and construes all evidence in favor of the nonmoving party.  *Tingle*, 692 F.3d at 529 (citing *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986)).  An issue is "genuine" within the meaning of Rule 56(a) "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party."  *Anderson*, 477 U.S. at 248.  Additionally, a fact is "material" within the meaning of Rule 56(a) if the dispute over it might affect the outcome of the lawsuit under the governing law.  *Id.*

Under Ohio law (which utilizes the Title VII standard), plaintiffs claiming discrimination may prove such a claim in one of two ways.  *See Weberg v. Franks*, 229 F.3d 514, 522–23 (6th Cir. 2000).  They can either provide direct evidence of discrimination, *id.*, or they can provide circumstantial evidence under the *McDonnell Douglas* standard, *see Thompson v. City of Lansing*, 410 F. App'x 922, 932 (6th Cir. 2011).  The Plaintiffs here challenge the district court's decision on both grounds.

**A.  Direct Evidence**

"Direct evidence is evidence that, if believed, 'requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions.'"  *Id.* at 929 (quoting *Wexler v. White's Fine Furniture, Inc.*, 317 F.3d 564, 570 (6th Cir. 2003)).  In other words, "[d]irect evidence must prove not only discriminatory animus, but also that the employer actually

acted on that animus." *Johnson v. Metro. Gov't of Nashville*, 502 F. App'x 523, 534 (6th Cir. 2012). Once a plaintiff demonstrates direct evidence of discrimination, "[t]he burden of persuasion then shifts to the defendant to show that it would have [taken the adverse employment action] absent the discriminatory motive." *Weberg*, 229 F.3d at 522-23.

The Plaintiffs argue that the district court erred in concluding that *Franko v. City of Cleveland*, 654 F.Supp. 2d 711 (N.D. Ohio 2009), and testimony associated with that case is direct evidence that the City of Cleveland engaged in discrimination in this case.[3] In *Franko*, the district court concluded that the plaintiff had "met his threshold burden of establishing the City of Cleveland is that unusual employer that discriminates against the majority." 654 F. Supp. 2d at 718. The Plaintiffs also argue that *Lentz v. City of Cleveland*, 335 F. App'x 42 (6th Cir. 2009) is direct evidence of discrimination in this case.[4] In *Lentz*, a jury concluded that the City of Cleveland engaged in discrimination against a Caucasian police officer after he shot an African American male during a pursuit of that individual's vehicle. 333 F. App'x at 43 (6th Cir. 2009).

The district court correctly concluded that these previous cases against the City of Cleveland were not direct evidence that McGrath discriminated against the Plaintiffs here. *Franko* and *Lentz* cases involved different traumatic events, different officers, different supervisors, and different decision-makers than the instant case. They do not demonstrate that McGrath had a discriminatory animus based on the November 2012 deadly force incident and that he acted on that animus. *See Johnson*, 502 F. App'x at 534. Thus, *Franko* and *Lentz* do not "require[] the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions" in *this* case. *Weberg*, 229 F.3d at 522.

---

[3]Citing *Parklane Hosiery Co. v. Shore*, 439 U.S. 322 (1979), the Plaintiffs also argue that *Franko* should be considered direct evidence in this case under the doctrine of offensive collateral estoppel. However, they fail to offer any argument beyond that conclusory statement. We find this argument forfeited. *See United States v. Johnson*, 440 F.3d 832, 846 (6th Cir. 2006) ("[I]t is a settled appellate rule that issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed forfeited." (quoting *United States v. Elder*, 90 F.3d 1110, 1118 (6th Cir. 1996)).

[4]The Plaintiffs made this argument in the "Preamble" to their analysis of the assignment of error. They neglected to mention *Lentz* in the section of their brief entitled "Direct Evidence." We analyze it anyway, as the "Preamble" appears to make the applicable argument.

**B. The McDonnell Douglas Standard**

A plaintiff can also prove a discrimination claim pursuant to a modified version of the *McDonnell Douglas* standard. *See Weberg*, 229 F.3d at 523; *Murray v. Thistledown Racing Club, Inc.*, 770 F.2d 63, 67 (6th Cir. 1985). Under this standard, a plaintiff must demonstrate "(1) background circumstances supporting the inference that plaintiff's employer was the unusual employer who discriminated against non-minority employees, (2) that plaintiff was discharged (or that the employer took an action adverse to the plaintiff's employment), (3) that plaintiff was qualified for the position, and (4) that plaintiff was treated disparately from similarly situated minority employees." *Courie v. ALCOA*, 832 N.E.2d 1230, 1235 (Ohio Ct. App 2005); *see Murray*, 770 F.2d at 67.

If a plaintiff successfully establishes a prima facie case of discrimination, "the burden shifts to the defendant 'to articulate some legitimate, nondiscriminatory reason for the employ[er]'s [decision].'" *Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981) (quoting *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802 (1973)). If a defendant successfully articulates a legitimate, non-discriminatory reason for the employment decision, then the burden shifts back to the plaintiff to demonstrate that the reason is a pretext for discrimination. *Id.* The plaintiff can demonstrate pretext by showing that the defendant's proffered reason "(1) has no basis in fact; (2) did not actually motivate the defendant's challenged conduct; or (3) was insufficient to warrant the challenged conduct." *Dews v. A.B. Dick Co.*, 231 F.3d 1016, 1021 (6th Cir. 2000); *see id.*

The Plaintiffs challenge the district court's conclusions on nearly every basis of the *McDonnell Douglas* standard. We focus on whether the Plaintiffs have demonstrated similarly-situated comparables and whether the proffered reason for their return to restricted duty was a pretext for discrimination.

**1. Similarly-Situated Comparables**

To sufficiently demonstrate similarly-situated employees, plaintiffs must show that the proffered "comparables" are similar "in all respects." *Pohmer v. JPMorgan Chase Bank, N.A.*, No. 14AP-429 2015 WL 1432546, *9 (Ohio Ct. App. Mar. 31, 2015) (internal quotation marks,

citations, and emphasis omitted). In other words, the plaintiff must show that "all of the relevant aspects of his employment situation were 'nearly identical' to those of the [comparable employee's] employment situation.'" *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (emphasis omitted) (quoting *Pierce v. Commonwealth Life Ins.*, 40 F.3d 796, 802 (6th Cir. 1994)). For example, the comparables "must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it." *Id.* (quoting *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992)).

To meet this requirement, the Plaintiffs here proffered a Microsoft Excel spreadsheet, which they compiled and which includes information about deadly force incidents, the officers involved, and the length of their assignment to restricted duty. The Plaintiffs complain that even though the Defendants did not dispute the information, the district court "took it upon itself to impeach" the report and undermine the statistics, violating the standard for reviewing a motion for summary judgment. Br. 44–45. The Plaintiffs argue that the spreadsheet demonstrates seven similarly situated African American police officers who were ordered to the Gymnasium after traumatic incidents for less time than they were.

In *Bazemore v. Friday*, 478 U.S. 385, 400–01 (1986), the Supreme Court addressed the probative value of statistical information in Title VII discrimination cases:

> While the omission of variables from a regression analysis may render the analysis less probative than it otherwise might be, it can hardly be said, absent some other infirmity, that an analysis which accounts for the major factors "must be considered unacceptable as evidence of discrimination." Normally, failure to include variables will affect the analysis' probativeness, not its admissibility.
>
> Importantly, it is clear that a regression analysis that includes less than "all measurable variables" may serve to prove a plaintiff's case. A plaintiff in a Title VII suit need not prove discrimination with scientific certainty; rather, his or her burden is to prove discrimination by a preponderance of the evidence. *Texas Dept. of Community Affairs v. Burdine*, 450 U.S. 248, 252 (1981). Whether, in fact, such a regression analysis does carry the plaintiffs' ultimate burden will depend in a given case on the factual context of each case in light of all the evidence presented by both the plaintiff and the defendant. However, as long as the court may fairly conclude, in light of all the evidence, that it is more likely

than not that impermissible discrimination exists, the plaintiff is entitled to prevail.

*Id.* In *Lentz*, we concluded that certain officers were similarly situated to the plaintiffs because they "participated in automobile-related shootings and received gym duty assignments while under investigation pursuant to the relevant Departmental procedures." 333 F. App'x at 46.

We find that the Plaintiffs' proffered spreadsheet has serious infirmities that greatly undermine its credibility. First, it does not address all of the "relevant" aspects of the Plaintiffs' employment situation. The spreadsheet contains the following columns: the date of the traumatic incident; the UDF report number; the officer involved; the level of the suspect's injury; the race, sex, and age of the suspect; the date the officer was assigned to the Gymnasium; and the date the officer left restricted duty. Critically, the spreadsheet does not include information regarding, for example, who the officers' supervisor was;; what type of investigation followed; a comparison of time spent on transitional duty; whether an officer requested to stay in the Gymnasium; or whether an officer was required to stay in the Gymnasium by medical officials. *See Ercegovich*, 154 F.3d at 352. It further fails to demonstrate the information that we suggested in *Lentz*— whether the Gymnasium assignment was pending the length of the subsequent investigation. Without these additional considerations, the probative value of this spreadsheet is greatly undermined.[5]

Second, the Plaintiffs claim that the spreadsheet shows that non-African American officers who used deadly force and killed African American suspects spent an average of 239.38 days on restricted duty. However, according to the spreadsheet, that is not true. That average is skewed by the inclusion of dates for which the Plaintiffs were detailed to transitional duty assignments. At oral argument, the Plaintiffs conceded that these dates should not have been included in the calculations.

---

[5]For example, comparables' average time on restricted duty is skewed by an outlier, an individual who spent only eight days assigned to the Gymnasium. Without additional information, it is hard to determine whether this individual is truly a comparable.

Based on these infirmities, the district court did not err in finding the statistics insufficient to establish similarly-situated comparables. Thus, the Plaintiffs have failed to demonstrate this prong of the modified *McDonnell Douglas* standard.

## 2. Legitimate, Nondiscriminatory Reason A Pretext For Discrimination

Even if we were to assume that the Plaintiffs met their burden on the first prongs of the *McDonnell Douglas* standard, "the burden [then] shifts to the employer to proffer a legitimate, nondiscriminatory reason for its decision." *Arnold v. City of Columbus*, 515 F. App'x 524, 530 (6th Cir. 2013) (citation omitted). If the defendants proffer such a reason, the burden returns to the plaintiffs to establish "by a preponderance of the evidence that the reasons offered by the employer were a pretext for discrimination." *Gribcheck v. Runyon*, 245 F.3d 547, 550 (6th Cir. 2001). Pretext can be shown in one of three ways: "(1) that the proffered reason[] had no basis in fact, (2) that the proffered reason[] did not actually motivate the employer's action, or (3) that [the reason was] insufficient to motivate the employer's action." *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009).

In explaining their legitimate, non-discriminatory reason for their action, the Defendants rely on McGrath's testimony. He stated that after the PTIP policy was complete, he ordered the officers to return to their home district on full duty but verbally instructed their commanding officers that they be assigned only transitional duties. When he discovered that they had been returned to full duty, contrary to his verbal orders, he ordered them back to restricted duty until the investigation was complete. McGrath states he discovered the Plaintiffs were not detailed to transitional duties as a result of a conversation in his office.

The Plaintiffs claim that McGrath's excuse for returning them to the Gymnasium—that he "discovered" that they had been returned to full duty in violation of his verbal orders that they were to remain on transitional duty—was a pretext for discrimination. Instead, they claim that they were subsequently, and wrongfully, ordered to the Gymnasium until the prosecutor's review was complete as a result of a media inquiry about their employment status. The Plaintiffs cite a news article as well as testimony suggesting that written orders returning officers to full duty accompanied by verbal orders that they be assigned to transitional duty was unusual.

The Plaintiffs have failed to carry their burden on this claim. The same day that the Plaintiffs were ordered to the Gymnasium for a second time, 19 Action News posted an article online about the Plaintiffs' employment status. The Plaintiffs argue that this shows that McGrath acted based on racial tensions in the community and the media inquiry—not based on a discovered mistake. However, the news article states that it originally reported that the officers had returned to full duty in June, about four months prior McGrath's order that they return to restricted duty. The article then states that McGrath has now decided that that decision was inappropriate. Accordingly, he ordered the Plaintiffs "off the streets until a county prosecutor decides on any criminal charges." R. 54-15, PageID #672. R. 5.

Nothing in the article suggests or implies that it was as the result of a media inquiry that McGrath moved the officers to restricted duty; it only reports McGrath's decision to assign the officers involved in the Russell/Williams shooting to restricted duty. There is also nothing in the article that indicates that McGrath's decision was based on the Plaintiffs' race. If anything, the article undermines those arguments. It pointedly states that it had previously reported the Plaintiffs' status, and it explains that McGrath decided to order the Plaintiffs to be assigned to restricted duty until all investigations were complete.

Additionally, the Plaintiffs argue that it was unusual for McGrath to issue a written order indicating the Plaintiffs were to return to full duty while verbally ordering them to maintain transitional duties. They also argue that it was unreasonable for five months to pass before McGrath realized that his orders were compromised. However, they fail to point to any evidence that this did not, in fact, happen this way.[6] For example, they could have deposed Calvin Williams, the officer who received the verbal order from McGrath regarding the Plaintiffs' duty status, but they did not. Without any contrary evidence to McGrath's assertions, the Plaintiffs have not demonstrated that his decision to keep the Plaintiffs or transitional duty until the

---

[6]As the Defendants point out in their brief, even if the Plaintiffs could show discrimination, they would have to contend with the honest belief doctrine. The honest belief doctrine dictates that "[i]f the employer had an honest belief in the proffered basis for the adverse employment action, and that belief arose from reasonable reliance on the particularized facts before the employer when it made the decision, the asserted reason will not be deemed pretextual, even if it was erroneous." *Loyd v. Saint Joseph Mercy Oakland*, 766 F.3d 580, 596 (6th Cir. 2014) (quoting *Upshaw v. Ford Motor Co.*, 576 F.3d 576, 586 (6th Cir. 2009)).

outcome of the prosecutor's investigation was a pretext for discrimination against them based on their race.  See Chen, 580 F.3d at 400.  Thus, the Plaintiffs' discrimination claim fails.

**IV.**

The Plaintiffs assert several arguments regarding their additional claims.  First, they claim that based on their purported establishment of a prima facie case of discrimination, the district court erred in concluding that their § 1981 discrimination claim and their § 1983 discrimination claim each fail.  For the reasons stated above, the Plaintiffs have not posited a prima facie case of discrimination.

Second, the Plaintiffs argue that the district court erred in denying them relief on their equal protection claim because, based on their argument that the Defendants discriminated against them in violation of Ohio Revised Code § 4112.02, the Defendants treated them differently than their African American colleagues.  Again, for the reasons stated above, the Plaintiffs failed to articulate a "racially discriminatory intent or purpose" to demonstrate an equal protection claim.  *City of Cuyahoga Falls v. Buckeye Cmty. Hope Found.*, 538 U.S. 188, 194 (2003) (indicating that "[p]roof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause").

Third, utilizing § 1983, the Plaintiffs argue that the district court wrongfully concluded that they did not have a property interest in their "secondary employment, overtime pay, court appearances, and transfers," which the City deprived them without due process.  Br. 59.  The Plaintiffs assert that the Collective Bargaining Agreement (CBA) with Cleveland establishes a property interest in various entitlements.  "To have a property interest in a benefit, a person clearly must have more than an abstract need or desire for it.  He must have more than a unilateral expectation of it.  He must, instead, have a legitimate claim of entitlement to it."  *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972).

Each of the entitlements the Plaintiffs discuss is discretionary with the City of Cleveland and its officials; thus, the Plaintiffs have no "legitimate claim of entitlement to" them.  *Id.*; *see, e.g.*, R. 53-4, PageID #421 ("The City shall be the sole judge of the necessity for overtime."); R. 54-29, PageID #1019 (indicating that "[u]pon written permission by the Chief of Police and

the Director of Public Safety, Division members *may* engage in secondary employment if the work does not interfere with Division employment and there is no conflict of interest between the work and the Division" (emphasis added)); R. 53-3, PageID #402 ("Supervisors shall: Approve all in-house assignments (court appearances, property runs, etc[.])…"). As the district court explained, and the Plaintiffs fail to correct on appeal, they "do not allege any facts to show that they were not able to apply for transfers or to sit for promotional exams." R. 68, PageID #1505. Further, the CBA's provisions for certain pay rates do not demonstrate that Plaintiffs then have a property interest in those wages. Thus, the district court did not err in concluding that the Plaintiffs lacked legitimate property interests in any of these various benefits.

Fourth, the Plaintiffs claim that the district court misconstrued *Glover v. St. Louis-San Francisco Railway Co.*, 393 U.S. 324, 330 (1969), and wrongfully dismissed their breach of contract claim by concluding that the Plaintiffs should have attempted to avail themselves of the CBA's grievance procedure. Instead, they argue that any attempt to utilize the CBA's grievance procedure would have been futile, given that McGrath played a role in the grievance procedure.

The district court did not err in distinguishing *Glover* from the case here. Notably, *Glover* is the exception, not the rule. 393 U.S. at 330. We have explicitly held that "[i]t is clear that when arbitration is mandatory, an employee must at least attempt to use and exhaust the contractual grievance procedure before seeking judicial review of his claim." *Atkins v. Louisville & Nashville R. Co.*, 819 F.2d 644, 649 (6th Cir. 1987) (citing *Republic Steel Corp. v. Maddox*, 379 U.S. 650 (1965)). In *Glover*, the Supreme Court did not require African American railroad employees to utilize all of the available grievance procedures. 393 U.S. at 331. This was because of extensive collusion between the bargaining representatives and the railroad. *Id.* As a result, the African American employees' complaints "were either ignored or actively discouraged" and there was a "hostility of the union representatives toward the complaining employees." *Spicer v. Ford Motor Co.*, 491 F. App'x 543, 546 (6th Cir. 2012). That scenario is vastly different from the circumstances present here, where the Plaintiffs have not demonstrated that they even complained about their assignments prior to filing suit. Thus, the district court properly dismissed this claim.

**V.**

As history and Justice Marshall instructed us, we have carefully reviewed the issues surrounding the Plaintiffs' liberties during what was an emotional and sensitive time in Cleveland. Finding no error, we **AFFIRM** the district court's grant of summary judgment in favor of the Defendants.