RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)
File Name: 19a0281p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

---

MORRIS M. JOHNSON,

        *Plaintiff-Appellant*,

    *v.*

OHIO DEPARTMENT OF PUBLIC SAFETY,

        *Defendant-Appellee*.

No. 18-4181

---

Appeal from the United States District Court
for the Southern District of Ohio at Columbus.
No. 2:17-cv-00016—Algenon L. Marbley, District Judge.

Decided and Filed:  November 13, 2019

Before:  MOORE, COOK, and THAPAR, Circuit Judges.

---

### COUNSEL

**ON BRIEF:**  Daniel H. Klos, Columbus, Ohio, for Appellant.  Amy Ruth Ita, Wendy K. Clary, OFFICE OF THE OHIO ATTORNEY GENERAL, Columbus, Ohio, for Appellee.

      THAPAR, J., delivered the opinion of the court in which COOK, J., joined.  MOORE, J. (pp. 5–10), delivered a separate dissenting opinion.

---

### OPINION

---

      THAPAR, Circuit Judge.  The Ohio Department of Public Safety fired Trooper Morris Johnson after he sexually harassed multiple women while on duty.  Judge Algenon Marbley, in a thoughtful and thorough opinion, explained why the Department did not racially discriminate against Morris Johnson in doing so.  We adopt Judge Marbley's reasoning in full and affirm.

Morris Johnson pulled over a woman for a DUI, arrested her, and asked her out. A month later, he saw the same woman on the road and pulled her over—without probable cause—so he could talk to her. He asked her out again, told her he "liked" her, and asked her to go to the casino with him so they could "play some games together." R. 17, Pg. ID 316, 318–19. He also gave the woman his personal cell number and told her to hide it in a secret location. When the Department learned this, it considered firing Morris Johnson. But it let him sign a "Last Chance Agreement," which said the Department would not fire him if he followed the rules for two years.

Only he didn't follow the rules. Next, Morris Johnson pulled over another woman for a DUI. He arrested, searched, and handcuffed her. Then, he offered to take her home, even though she had texted someone to pick her up. On the ride home and for the rest of their encounter, he failed to turn on his in-car camera (a violation of Department policy). When he pulled into the woman's driveway, he radioed the station saying he was leaving. Yet he didn't leave. He stayed at the woman's house for *over thirty minutes*. Without camera footage, we cannot know what happened in those thirty minutes. Later, Morris Johnson texted the same woman from his personal cell phone with the message, "Yo yo," and "[It's] Me the person you hate." R. 17-1, Pg. ID 612. When the Department learned of this incident, it fired Morris Johnson for violating the Last Chance Agreement.

To make an initial case for racial discrimination, Morris Johnson must show that he was "similarly situated" "in all of the relevant respects" to an employee of a different race who was treated better. *Gragg v. Somerset Tech. Coll.*, 373 F.3d 763, 768 (6th Cir. 2004); *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344, 352 (6th Cir. 1998) (cleaned up). We consider whether the employees: (1) engaged in the same conduct, (2) dealt with the same supervisor, and (3) were subject to the same standards. *Mitchell v. Toledo Hosp.*, 964 F.2d 577, 583 (6th Cir. 1992). Although other factors may also be relevant, depending on the facts of each case, *Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019), the *Mitchell* factors are generally relevant. *Ercegovich*, 154 F.3d at 352. Here, no one disputes that the conduct of the officers and the standards to which they were subject are the most relevant factors.

Morris Johnson, a black trooper, points to David Johnson, a white trooper who received a one-day suspension.  No doubt, David Johnson also broke the rules.  He may have sent someone he had detained a Facebook friend request after he got off duty (the report was unverified).  Three years later, he made conversation with a woman after he issued her a citation, told her she resembled an actress, then later sent her a Facebook friend request and message saying he was thinking of a different actress.

So this case comes down to one question.  Was Morris Johnson similarly situated to David Johnson in all relevant respects?  That is, did the Department treat the two differently because of their race?  As the district court explained, the answer is no.  Morris Johnson and David Johnson are both troopers who acted inappropriately.  And they happen to share the same last name.   But the similarities end there.   The Department disciplined the two troopers differently because their situations were *different*.  Thus, Morris Johnson has failed to present a case for discrimination.

Consider each of the three factors.  First, conduct.  For one, David Johnson's first incident of sending a Facebook friend request was unverified.  Meanwhile the Department verified all of Morris Johnson's incidents.  But even accepting David Johnson's unverified incident as true, their acts were not of "comparable seriousness."  *Jackson v. VHS Detroit Receiving Hosp., Inc.*, 814 F.3d 769, 778 (6th Cir. 2016).

When it comes to comparable seriousness, it is the particular conduct of the officers, not broad generalizations, that counts.  Drawn at too high a level of generality, the "comparable seriousness" test becomes meaningless.  True, stitches and open-heart surgery are both medical procedures.  But that does not mean they are of "comparable seriousness."  Same here.

Evaluating the officers' conduct closely, the district court noted several differences.  Here are the highlights:

- Morris Johnson harassed intoxicated women.  David Johnson did not.
- Morris Johnson was on duty (wearing a uniform and carrying a sidearm) during his encounters.  David Johnson was not.
- Morris Johnson harassed women while he detained them (so they were not free to leave).  David Johnson did not.

- Morris Johnson propositioned a woman to go out with him. David Johnson did not.
- Morris Johnson pulled a woman over without probable cause to ask her out. David Johnson did not.
- Morris Johnson went to a woman's home. David Johnson did not.

The list goes on. As the district court explained, it's simple: "[T]he quantum of misbehavior is radically different, so one would naturally expect a radically different disciplinary outcome." R. 43, Pg. ID 2779.

What's more, the other two *Mitchell* factors support this conclusion. The two troopers had different direct supervisors. *See Redlin*, 921 F.3d at 610 (noting that this factor is not an "inflexible requirement"). And they were subject to different standards. Morris Johnson signed a Last Chance Agreement after his first incident. He was on notice that the Department *would* fire him if he committed another violation. David Johnson received a warning that the Department *may* discipline him if he didn't clean up his act. The district court described this as a "crucial distinction." R. 43, Pg. ID 2773.

\*\*\*

In the end, we expect police departments to take immediate and swift action when officers abuse their power. The Department did so here. And, as Judge Marbley thoughtfully found, there was nothing discriminatory about that action. We affirm.

---

**DISSENT**

---

KAREN NELSON MOORE, Circuit Judge, dissenting.  The majority concludes that Johnson cannot make out a prima facie case of racial discrimination under Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e-2(a), because he cannot identify a comparator based on the three factors mentioned in *Mitchell v. Toledo Hospital*, 964 F.2d 577 (6th Cir. 1992). However, the majority neglects the flexible approach that we adopted in *Ercegovich v. Goodyear Tire & Rubber Co.*, 154 F.3d 344 (6th Cir. 1998), and misconstrues the nonmoving plaintiff's burden at the prima facie stage of a discrimination claim at summary judgment, imposing too high burden upon Johnson.  I conclude that Johnson has set forth a prima facie case of racial discrimination against the Ohio Department of Public Safety ("the Department"), when the evidence is construed in the light most favorable to Johnson, and so I would remand the case to the district court for further proceedings.  Thus, I respectfully dissent.

When a plaintiff brings a discrimination claim based upon indirect evidence, as here, he must proceed under the *McDonnell Douglas* burden-shifting framework, first demonstrating a prima facie case of discrimination before the burden "shifts to the employer to offer a legitimate, non-discriminatory explanation for its actions," and then "back to the plaintiff to show pretext." *Chattman v. Toho Tenax Am., Inc.*, 686 F.3d 339, 347 (6th Cir. 2012) (quoting *Chen v. Dow Chem. Co.*, 580 F.3d 394, 400 (6th Cir. 2009)).  To make out a prima facie case, a plaintiff must show "that (1) he was a member of a protected class; (2) that he suffered an adverse employment action; (3) that he was qualified for the position; and (4) that a person outside the protected class was treated more favorably than him." *Braithwaite v. Timken Co.*, 258 F.3d 488, 493 (6th Cir. 2001) (citing *Manzer v. Diamond Shamrock Chems. Co.*, 29 F.3d 1078, 1081 (6th Cir. 1994)).  Only the fourth element is in dispute in this case.

The majority's analysis restricts our precedent regarding comparators, or those that a plaintiff must identify as similarly situated to himself.  For over twenty years, we have not applied *Mitchell v. Toledo Hospital*'s "similarly situated in all respects" approach, 964 F.2d at

583, but rather we adhere to a similarly situated "in all *relevant* respects" approach for determining whether the plaintiff has provided an appropriate comparator to satisfy the fourth element of a prima facie case, *Ercegovich*, 154 F.3d at 353 (emphasis in original) (citations omitted). *See also Redlin v. Grosse Pointe Pub. Sch. Sys.*, 921 F.3d 599, 610 (6th Cir. 2019) (same). It is true that part of our analysis in *Ercegovich* noted that the three *Mitchell* factors— same supervisor, same standards, and same conduct—"generally are all relevant considerations" in determining whether a proposed comparator is in fact similarly situated. *Ercegovich*, 154 F.3d at 352. But what we said next belies the majority's mechanical reliance on those factors: "Courts should not assume, however, that the specific factors discussed in *Mitchell* are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee." *Id.*; *see also Redlin*, 921 F.3d at 610 (quoting *Ercegovich*, 154 F.3d at 352). The current approach of this circuit is not to recite reflexively and apply all of the *Mitchell* factors, but rather to engage meaningfully with the facts of the case to determine which factors are relevant. *See, e.g.*, *Tennial v. United Parcel Serv., Inc.*, 840 F.3d 292, 304–05 (6th Cir. 2016) ("There is no specific list of factors that we must consider in making this determination [about whether a comparator is appropriate]."); *Bobo v. United Parcel Serv., Inc.*, 665 F.3d 741, 751 (6th Cir. 2012); *see also O'Donnell v. City of Cleveland*, 838 F.3d 718, 728 (6th Cir. 2016) (considering the *Mitchell* factors along with the length of investigations of deadly force incidents and other facts surrounding the use of deadly force). Here, I would hold that the most relevant factors to consider are the standards to which Johnson and his proposed comparator were subject, the similarities of their conduct as state troopers, and the provisions under which they were disciplined.

First, it is clear that Johnson and his comparator were subject to the same standards as all state troopers. Sensibly, it is not even an issue of contention that all state troopers must follow the Department's duly promulgated rules and regulations. However, the majority and the Department misapprehend the effect of the Last Chance Agreement ("LCA").

As Johnson aptly put it, the LCA speaks to the sanction for the conduct, not the standard for evaluating the conduct. Appellant Br. at 29. The LCA states that if Johnson violated either

of the provisions under which he was previously disciplined—Conduct Unbecoming an Officer and Performance of Duty—then he would be terminated. R. 17-1 (LCA at 121) (Page ID #460). This does not change the standard against which the Department evaluated his conduct—the rules applicable to all state troopers, specifically here, Ohio Administrative Code 4501:2-6-02(I) (2011), Conduct Unbecoming an Officer. *Id.* No one disputes that the regulatory rules apply to all state troopers with equal force, nor does the majority or the Department assert that Johnson was being more carefully scrutinized than his comparator.

What the LCA does provide for, however, is a possible explanation for the termination of Johnson's employment when his comparator was merely suspended: "If the Employee violates Rule 4501:2-6-02(I)(3) . . . *the Employee will be terminated*." *Id.* (emphasis added). Given the function of the LCA—to justify termination upon another infraction—it makes sense to consider the LCA in the burden-shifting stages after the prima facie stage. In fact, we did this in *Jackson v. VHS Detroit Receiving Hospital, Inc.*, our only published decision addressing an LCA in the discrimination context, where we considered a possible comparator's LCA in evaluating whether the employer's proffered reason for terminating the plaintiff was pretextual. *See* 814 F.3d 769, 782 (6th Cir. 2016) (explaining that a reasonable jury could infer discrimination when the comparator was treated better than the plaintiff because the comparator should have been fired under an LCA for the same offense as plaintiff, but the plaintiff was fired even though she was not subject to an LCA). I see no reason why we would treat an LCA differently here.

Second, Johnson and the comparator were both disciplined for attempting to develop relationships with women that they encountered while discharging their official duties by using personal information that they obtained from those interactions. R. 32-1 at 5–6 (Johnson Investigation 2015) (Page ID #2546–47); R. 32-2 at 5 (Comparator Investigation 2016) (Page ID #2615). These women knew them both as officers, and so there is an abuse of authority, actual or perceived, in both Johnson's on-duty incident and the comparator's off-duty incident. It was just as inappropriate for an officer in a position of public trust, just as abusive of at least a perceived use of official authority, and just as problematic due to the harassing nature of the conduct directed toward the women.

Third, the fact that Johnson and the comparator were disciplined under the same major provision is especially relevant in demonstrating that their conduct is of "comparable seriousness." *Jackson*, 814 F.3d at 778. The most important question in discrimination cases is whether the employer intentionally discriminated against the plaintiff, *Bobo*, 665 F.3d at 751 (quoting *Reeves v. Sanderson Plumbing Prods., Inc.*, 530 U.S. 133, 153 (2000)), and so how the employer views the infraction is important, *Jackson*, 814 F.3d at 783. In *Jackson*, we explained how the employer defines infractions of its rules is evidence of how the employer views such conduct; when the plaintiff and his comparator violate the same rule, it indicates that the employer views those infractions as "substantially identical in terms of potential disciplinary consequences." *Id.* Johnson and the comparator both were charged with Conduct Unbecoming an Officer. Although Johnson was ultimately terminated under a sub-provision for "attempt[ing] to cultivate a personal relationship with an arrestee," R. 32-1 (Johnson Termination Letter at 67) (Page ID #2608), and the comparator was suspended a different sub-provision for "attempt[ing] to establish a relationship with a female to whom he had issued a citation," R. 32-2 (Comparator Suspension Letter at 23) (Page ID #2633), I do not see anything in the provision that indicates that the Department necessarily views any of the prohibited behaviors as qualitatively different from each other. They are simply sub-provisions under the same umbrella of conduct, Conduct Unbecoming an Officer. *See* Ohio Admin. Code 4501:2-6-02(I) (2011).

The majority observes that Johnson and his comparator did not have the same supervisor, but again, our precedent does not require us to apply unthinkingly the *Mitchell* factors. This is particularly true of the same-supervisor factor. *Redlin*, 921 F.3d at 610 ("[W]e have never read 'the "same supervisor" criterium' as an 'inflexible requirement.'" (quoting *Bobo*, 665 F.3d at 751)). Rather, it depends on each case. *See id.* Here it is not relevant. As the Department describes its disciplinary process, disciplinary recommendations are funneled up a chain of command and the Department issues disciplinary decisions. *See* Appellee Br. at 10–11. There is simply no reason for us to consider this factor.

"[W]e have admonished that the plaintiff's burden 'at the prima facie stage is "not onerous" and "poses a burden easily met."'" *Jackson*, 814 F.3d at 776 (quoting *Provenzano v. LCI Holdings, Inc.*, 663 F.3d 806, 813 (6th Cir. 2011)). The only "purpose of the prima facie

stage of the burden-shifting framework is to 'eliminate[ ] the most common nondiscriminatory reasons for the plaintiff's [termination].'" *Id.* (quoting *Tex. Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 254 (1981)). In other words, the prima facie stage "is 'only the first stage of proof in a Title VII case,' and its purpose is simply to 'force [a] defendant to proceed with its case'. . . . [It] is not meant to stymie plaintiffs . . . ." *Cline v. Catholic Diocese of Toledo*, 206 F.3d 651, 660 (6th Cir. 2000) (citations omitted); *Provenzano*, 663 F.3d at 813 ("One common misapplication [of the stages of the burden-shifting framework] is the tendency to push all of the evidence into the prima facie stage and ignore the purpose for and application of the three stages."). We have expressed concern before that misconstruing the prima facie burden as a heavy one would mean that any unique circumstances would foreclose a plaintiff from bringing a meritorious claim. *See, e.g.*, *Bobo*, 665 F.3d at 751 ("Thus the focus of the litigation is not on a comparison of the 'employment status of the plaintiff and other employees in every single aspect of their employment[,' but] whether the plaintiff was the victim of intentional discrimination." (citations omitted)); *Ercegovich*, 154 F.3d at 353 ("[I]f the non-protected employee to whom the plaintiff compares himself or herself must be identically situated to the plaintiff in every single aspect of their employment, a plaintiff whose job responsibilities are unique to his or her position will *never* successfully establish a prima facie case (absent direct evidence of discrimination)." (emphasis in original)).

Moreover, we must view all of the evidence in the light most favorable to Johnson and draw all reasonable inferences in his favor. *Peltier v. United States*, 388 F.3d 984, 987 (6th Cir. 2004) (citing *Talley v. Bravo Pintino Rest., Ltd.*, 61 F.3d 1241, 1245 (6th Cir. 1995)). And at summary judgment, sometimes "the burden-shifting analysis can obfuscate the appropriate question—whether there exists a genuine issue of material fact." *Provenzano*, 663 F.3d at 813. The central question now is not how similarly situated we think Johnson and his comparator are, but whether a reasonable jury could find, based on the facts viewed in the light most favorable to him, that they are similarly situated such that it demonstrates the Department intentionally discriminated against Johnson because of his race.

Given these principles, I would hold that Johnson has satisfied the fourth element of the prima facie test by pointing to his comparator. Johnson has put forth enough evidence that he and the comparator engaged in comparably serious behavior because both abused the public confidence in their positions as state troopers to harass women whom they encountered in their roles as state troopers. Therefore, Johnson has satisfied the first stage of the burden-shifting framework. Accordingly, I dissent, and I would remand the case to the district court for further proceedings.