**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**

File Name: 15a0422n.06

**Case No. 14-6132**

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

**FILED**
Jun 08, 2015
DEBORAH S. HUNT, Clerk

| | | |
|---|---|---|
| ROBBIE PICKETT EVANS and GEORGE R. BOOTH, | ) | |
| | ) | |
| | ) | |
| *Plaintiffs-Appellants*, | ) | ON APPEAL FROM THE |
| | ) | UNITED STATES DISTRICT |
| v. | ) | COURT FOR THE EASTERN |
| | ) | DISTRICT OF TENNESSEE |
| PROFESSIONAL TRANSPORTATION, INC., | ) | |
| | ) | |
| *Defendant-Appellee*. | ) | |
| | ) | O P I N I O N |

BEFORE:     COLE, Chief Judge; MERRITT and BATCHELDER, Circuit Judges.

COLE, Chief Judge.   Plaintiffs-Appellants Robbie Evans and George Booth appeal the district court's grant of summary judgment on their claim brought under the Fair Labor Standards Act ("FLSA"), 29 U.S.C. § 215(a)(3).   Evans and Booth allege that Professional Transportation, Inc. ("PTI"), terminated them in retaliation for joining a lawsuit against the company.   The district court concluded that Evans and Booth failed to establish a prima facie case of retaliation because they were unable to show that the supervisor who terminated them had knowledge of their engagement in a protected activity under the FLSA.   For the reasons discussed below, we AFFIRM the district court's grant of summary judgment.

## I. BACKGROUND

PTI is in the business of transporting railroad crews. Evans began working as a driver at PTI's Chattanooga branch in 2007. She was promoted to assistant manager in 2008 and became the branch manager of the Chattanooga office in 2009. As manager, Evans's duties included general oversight of the branch, including staffing and employee training.

Booth began working as a driver for PTI in Chattanooga in 2009, and later that year was promoted to be the assistant manager of the branch. Booth's duties included managerial tasks, employee training, and some driving.

PTI's branch offices, including Chattanooga, are staffed by drivers who are scheduled to pick up railroad crews in company vans and transport them between locations. If no regular drivers were available, branch managers sometimes would drive the vans themselves or hire taxicabs. PTI rates the performance of each office based on several factors, including the percentage of trips that are on time ("on time performance" or "OTP"), the frequency of taxicab use, and the adequacy of staffing. Despite some issues with driver retention and turnover, under Evans and Booth's management, the Chattanooga branch was generally considered one of the better performing branches in its division.

In 2009, a group of employees filed a lawsuit against PTI seeking overtime compensation. In that case, *Miller v. Professional Transportation, Inc.*, 3:09-cv-111 (S.D. Ind.), a settlement agreement was reached in the summer of 2011 and resulted in an overhaul of the system by which the company scheduled and tracked overtime hours for its employees. Consequently, the *Miller* litigation was widely known to PTI's management. Evans and Booth testified that, during the course of the litigation, they had conversations with Kenneth Lanzon, a PTI regional manager, in which Lanzon suggested that PTI planned to "set up" the *Miller*

plaintiffs for termination because PTI's President, Ronald Romain, "would not allow anybody to sue him and receive money and continue to work for his company." (Evans Dep., R. 24-3, PageID 391.)

In August 2011, a second group of employees filed another lawsuit, *Matthews, et al. v. Professional Transportation, Inc. & Ronald Romain*, 3:11-cv-97 (S.D. Ind.), seeking overtime compensation against PTI and its President. Evans and Booth opted into the *Matthews* litigation on March 1, 2012. They did not inform their supervisors that they had opted in, nor did they know whether their supervisors were aware of the *Matthews* litigation.

In February 2012, Evans attended a day-long workshop with several other branch managers. At that time, several branches, including the Chattanooga office, were still using taxis to transport crew members despite the fact that PTI's management had informed Evans by email in October 2011 that taxicabs were no longer to be used in her branch, or in several others. While Evans was not aware of any performance deficiencies in her office, several days after the February meeting she was told to develop a plan to improve her branch's OTP and eliminate cab usage.

In March 2012, Evans began experiencing difficulties maintaining the Chattanooga branch's performance. In addition to the heightened emphasis on eliminating taxicab usage, Evans and Booth were prohibited from driving vans and told to "focus 100% of their efforts on recruiting, hiring and training . . . to get the schedule 100% full." (Email from Michael Morin, March 14, 2012, R. 24-21, PageID 686.) Also, maintenance on the Chattanooga branch's vans was subject to increased delays.

Evans had also been encountering significant and ongoing disciplinary problems with two employees, Marc McKibben and Jayanna Dotson. At the February 2012 meeting, PTI's

- 3 -

Human Resources Director, Steven Greulich, and Senior Director of Operations, Danny Barr, instructed Evans not to take any disciplinary action against either McKibben or Dotson, but instead to direct such matters to Greulich. McKibben's deficiencies continued, culminating in a verbal confrontation with Evans in March 2012 after Evans purportedly made several unsuccessful attempts to contact Greulich about McKibben. McKibben reported the incident to Greulich. Evans then emailed Romain and Steven McClellan, PTI's Vice President of Operations, informing them that she intended to discipline McKibben further, despite Greulich and Barr's instructions that such discipline was Greulich's responsibility, not Evans's. Evans also verbally disciplined Dotson in March 2012. Later that month, Michael Morin, PTI's Director of Operations, visited the Chattanooga branch and Evans told him about Dotson's discipline and the confrontation with McKibben.

Meanwhile, Morin had begun hiring management-level employees from outside the company in late 2011 and covertly sending them to branch offices to interview and train as drivers. In February 2012, Morin hired Robert McElroy as an "undercover manager" and assigned him to apply for a driver position at the Chattanooga branch. McElroy began training on March 20, 2012, reporting by email that Evans had done a "good job" on his first day.

Booth trained McElroy to drive routes in company vans. McElroy testified that, during the training, Booth drove aggressively, used offensive language, and instructed McElroy and another trainee how to falsify trip vouchers and circumvent PTI's policy against speeding. Booth also advised McElroy and the other trainee that smoking while on duty was against company policy but that if they did smoke, they should do so away from crews and with the van windows down.

Morin sent an email to McClellan, Barr and Greulich on Friday, March 30, 2012, recommending that Evans and Booth be terminated. His email mentioned the outstanding staffing and OTP issues at the Chattanooga branch, but focused primarily on Evans's actions against McKibben and Dotson and Booth's conduct as reported by McElroy. Morin wrote that he had decided to terminate Evans for her "willful failure to follow specific, easy to understand instructions" and Booth "for performance, effective today, 3/30/12." (Email from Michael Morin, March 30, 2012, R. 24-30, PageID 707–08.) McClellan replied on the same day that he would "forward to Ron [Romain] with additional comments related to all of your, [Greulich], and [Barr's] proactive activities to address this issue." (*Id.* at 707.) Evans and Booth were terminated the following Monday, on April 2, 2012.

Evans and Booth filed this lawsuit in June 2012 in the United States District Court for the Eastern District of Tennessee, alleging that PTI violated the FLSA by retaliating against them for engaging in protected activity. Specifically, they contend that they were terminated because they joined the *Matthews* litigation. PTI moved for summary judgment, arguing that the plaintiffs could not make out a prima facie case of retaliation because Morin, the individual who decided to terminate their employment, did not know of the *Matthews* lawsuit. PTI further argued that even if the plaintiffs could make a prima facie case, PTI had a legitimate, non-retaliatory reason for firing both plaintiffs. The district court granted summary judgment to PTI, finding that the plaintiffs did not make out a prima facie case of retaliation because Morin, the person who terminated them, did not have knowledge of Evans or Booth's involvement in the *Matthews* litigation. Accordingly, the district court did not reach the issue of whether PTI's reasons for terminating the plaintiffs were pretextual. They now appeal.

## II. ANALYSIS

"We review a district court's grant of summary judgment de novo." *Guyan Int'l, Inc. v. Prof'l Benefits Adm'rs, Inc.*, 689 F.3d 793, 797 (6th Cir. 2012). Summary judgment is proper if there are no genuine disputes of material fact and the moving party is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(a). In determining whether PTI was entitled to summary judgment, we view the evidence in the light most favorable to the non-moving parties and draw all reasonable inferences in their favor. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986).

The anti-retaliation provision of the FLSA makes it unlawful for an employer "to discharge or in any other manner discriminate against any employee because such employee has filed any compliant or instituted or caused to be instituted any proceeding under or related to" the FLSA. 29 U.S.C. § 215(a)(3). A plaintiff may prove unlawful retaliation either with direct evidence of such retaliation or with circumstantial evidence establishing a prima facie case under the burden-shifting framework of *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973). *See Taylor v. Geithner*, 703 F.3d 328, 336 (6th Cir. 2013). The plaintiffs offer no direct evidence of retaliation, so they must establish a prima facie case in reliance on circumstantial evidence. "To establish a prima facie case of retaliation, an employee must prove that (1) he or she engaged in a protected activity under the FLSA; (2) his or her exercise of this right was known by the employer; (3) thereafter, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected activity and the adverse employment action." *Adair v. Charter Cnty. of Wayne*, 452 F.3d 482, 489 (6th Cir. 2006). If the plaintiffs succeed in making out the elements of a prima facie case of retaliation, the burden of production shifts to PTI to articulate a legitimate, non-retaliatory reason for the terminations. *Dixon v. Gonzales*, 481

F.3d 324, 333 (6th Cir. 2007).  If PTI satisfies its burden of production, the burden shifts back to the plaintiffs to show that the reason was a pretext for retaliation.  *Id.*  "Although the burden of production shifts between the parties, the plaintiff[s] bear[] the burden of persuasion throughout the process." *Id.*

On appeal, the only contested issue is whether the plaintiffs satisfied the second element of the prima facie case, that PTI knew of their protected activity.  Circumstantial evidence can support a reasonable inference of the decisionmaker's knowledge if the evidence is comprised of "specific facts" and not merely "conspiratorial theories," "flights of fancy, speculations, hunches, intuitions, or rumors." *Mulhall v. Ashcroft,* 287 F.3d 543, 552 (6th Cir. 2002) (quoting *Visser v. Packer Eng'g Assocs., Inc.*, 924 F.2d 655, 659 (7th Cir. 1991)).  We have inferred knowledge of protected activity in situations where the decisionmaker "took an action with respect to the plaintiff, other than the challenged adverse action, from which it could be inferred that the [decisionmaker] was aware of the plaintiff's" protected activity. *Id.* at 552–53.

The district court concluded that the plaintiffs did not meet this burden, and we agree.  Contrary to their contention, plaintiffs cannot establish the second element of the prima facie case of retaliation merely by showing that PTI had "general corporate knowledge" of their participation in *Matthews*.  They must show that Morin, the decisionmaker, knew of their involvement in the *Matthews* litigation. *See Frazier v. USF Holland, Inc.*, 250 F. App'x 142, 148 (6th Cir. 2007) ("The decisionmaker's knowledge of the protected activity is an essential element of the prima facie case of unlawful retaliation.") (citing *Mulhall,* 287 F.3d at 551).

The plaintiffs assert that Morin *must* have known about their participation in *Matthews* because he only involved himself in employee discipline when an employee had taken legal action against PTI.  This argument fails for two reasons.  First, Morin initiated undercover

manager investigations into several other branches in 2011, each of which resulted in terminations of employees, none of whom were involved in overtime or pay-related lawsuits against PTI. Second, Morin had already begun investigating the Chattanooga branch in February 2012, when he assigned McElroy to be an undercover manager, well before the plaintiffs joined the *Matthews* litigation on March 1, 2012. Thus, Morin's decision to send McElroy to the Chattanooga branch could not be related to the plaintiffs' subsequent decision to join a lawsuit against PTI. The plaintiffs also suggest that Morin's use of an undercover manager investigation was itself suspicious because he told McElroy to make his reports by phone, rather than in writing. But this suggestion is belied by the fact that the previous undercover managers had also reported to Morin by phone. There is no evidence that Morin's involvement in the plaintiffs' terminations or his use of McElroy as an undercover manager suggest that he knew of their participation in *Matthews*.

The plaintiffs also contend that Morin *must* have known about their participation in *Matthews* because he banned them, but no other managers from any other branch, from driving vans. Because driving vans had caused the plaintiffs to accrue significant overtime in the past, and *Matthews* was a lawsuit for overtime compensation, they infer that Morin banned them from driving in response to their complaints in *Matthews*. In other cases, we have found circumstantial evidence sufficient to infer employer knowledge where such knowledge was the only explanation for an employer's action. *See Allen v. Michigan Dep't of Corr.*, 165 F.3d 405, 413 (6th Cir. 1999); *see also Mulhall*, 287 F.3d at 552–53. But here, the prohibition on driving was a response to scheduling concerns at the Chattanooga branch originating before the plaintiffs' protected activity. PTI's management emphasized that Evans needed to hire more personnel for the Chattanooga branch at least as early as February 2012. That problem persisted

into March, when the plaintiffs were told to stop driving vans so that they could "focus 100% of their efforts on recruiting, hiring and training . . . in order to get the schedule 100% full." (Email from Michael Morin, March 14, 2012, R. 24-21, PageID 686.) Therefore, Morin's ban on the plaintiffs' driving does not suggest that he knew they had joined *Matthews* because the ban arose from concerns that pre-dated their protected activity.

The plaintiffs next suggest that they can establish the employer's knowledge prong of their prima facie case by showing that there was a scheme by "Morin and other high-level managers" to set them up for termination. As evidence of this alleged plot, the plaintiffs first point to an allegedly hostile attitude in PTI's management towards those who joined suits against the company, but any purported attitudes are irrelevant to whether the managers actually had knowledge of protected activity. The plaintiffs also point to the difficulties they encountered in March 2012 that negatively impacted the Chattanooga branch's performance, suggesting that these difficulties were intentional acts of sabotage. At the outset, the allegation that PTI's management would undermine its own branch's performance and profitability as part of a scheme to fire the plaintiffs is precisely the sort of conspiracy theory that rarely supports an inference of knowledge of protected activity. *See Mulhall*, 287 F.3d at 552. The specific examples that the plaintiffs characterize as sabotage are the ban on driving vans themselves, the prohibition on the use of taxis in the Chattanooga branch, and maintenance delays. While each of these examples may have had some negative impact on the Chattanooga branch's OTP, none of them suggest the existence of a plot to set the plaintiffs up for termination. As we have noted, Morin's van-driving prohibition arose from performance concerns that originated before the plaintiffs joined *Matthews*. Likewise, PTI's management instructed Evans to stop using taxicabs in her branch at least as early as October 2011, months before she joined *Matthews*. Finally, as

to the maintenance delays in March 2012, there is no evidence that anyone involved in the decision to terminate the plaintiffs had any control over maintenance problems, let alone caused these delays. Thus, there is no evidence to support the inference that there was a scheme to set up the plaintiffs for termination, much less that such a scheme might have been predicated on Morin's knowledge that they had joined *Matthews*.

The plaintiffs also contend that they can establish the second prong of their prima facie case of retaliation by showing that Greulich knew about their protected activity. Even though Morin made the ultimate decision to terminate them, the plaintiffs assert that Greulich regularly interacted with Morin regarding employee discipline in March 2012, and so it is reasonable to infer that he would have told Morin about the plaintiffs' participation in *Matthews*. *See Mulhall*, 287 F.3d at 553. But the plaintiffs have failed to provide any evidence that Greulich actually knew about their protected activity, so they cannot make out a prima facie case by relying on the theory that he *might* have told Morin about it. They first assert that Greulich likely knew of their participation in the *Matthews* litigation because human resources directors are generally aware of lawsuits against their companies. Such a general assertion is insufficient to support the specific inference that Greulich knew of the particular protected activity here. *See Scott v. Eastman Chem. Co.*, 275 F. App'x 466, 482 (6th Cir. 2008) (holding that a plaintiff must make a specific showing that the particular individuals responsible for the adverse employment decision "likely had knowledge of [the] protected activity"). Second, the plaintiffs suggest that Greulich intentionally refused to respond to Evans's calls related to McKibben's insubordination in an effort to force Evans herself to discipline McKibben, which would provide a basis for Evans's termination. Again, without evidence to suggest that Greulich deliberately delayed his responses

to Evans about McKibben, such an unsupported conspiracy theory cannot create an inference that Greulich knew of the plaintiffs' participation in the *Matthews* litigation.

The plaintiffs next allege that Romain must have known about their participation in *Matthews* because he was a named defendant in that suit. But even if Romain did know that they were involved in *Matthews*, this would not establish the plaintiffs' prima facie case because the record reveals that Romain did not make the decision to terminate them. The plaintiffs point to McClellan's March 30, 2012 email in which he said that he would forward the termination recommendation to Romain. To be sure, "knowledge of a plaintiff's protected activity can be inferred from evidence of the *prior* interaction of individuals with such knowledge and those taking the adverse employment action." *Mulhall*, 287 F.3d at 553 (emphasis added). But the March 30 email chain merely shows that McClellan informed Romain about the termination decision that Morin had already made. Therefore there is no evidence that Romain was involved in the decision to fire the plaintiffs; accordingly, they cannot establish the second element of their prima facie case even if Romain knew that they participated in *Matthews*.

Finally, the plaintiffs point out that they were terminated a mere thirty-two days after they joined the *Matthews* litigation. "Temporal proximity, when coupled with other facts, may be sufficient in certain cases to establish the causal-connection prong" of a prima facie case of retaliation, but we have generally declined to consider temporal proximity to establish the employer's-knowledge prong. *Id.* at 551. The plaintiffs, however, urge us to consider temporal proximity here, arguing that it can support both the employer's-knowledge and causal-connection prongs of the prima facie case. But the plaintiffs have produced no other evidence that Morin had knowledge of their participation in *Matthews*, so even if temporal proximity can

sometimes serve as circumstantial evidence of an employer's knowledge, here the temporal proximity is not sufficient to establish this prong of the prima facie case.

Because the plaintiffs have not established a prima facie case of retaliation, we need not determine whether PTI has proffered a non-retaliatory reason for the plaintiffs' terminations, nor whether any such reason is pretextual. *See Grubb v. YSK Corp.*, 401 F. App'x 104, 112 (6th Cir. 2010) (holding that it is generally inappropriate to consider an employer's proffered reasons for terminating an employee before the employee has made out a prima facie case).

### III. CONCLUSION

For the foregoing reasons, we AFFIRM the judgment of the district court.