CLAY, Circuit Judge.
Plaintiff Debra Redlin appeals the district court's grant of summary judgment for Defendant Grosse Pointe Public School System. She argues on appeal that the district court erred because a genuine issue of material fact existed as to her claims that Defendant discriminated against her on the basis of her gender and retaliated against her in violation of Title VII and Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), and as to her Family and Medical Leave Act ("FMLA") retaliation claim. For the reasons set forth below, we AFFIRM IN PART and REVERSE IN PART the district court's grant of Defendant's motion for summary judgment and REMAND the case for trial.
BACKGROUND
Factual Background
Plaintiff was hired as an Assistant Principal at Grosse Pointe South High School ("GPSHS") in September of 2012. In 2014, Deputy Superintendent Jon Dean informed another Assistant Principal, Terry Flint, that he planned to conduct a spot-check on a social worker suspected of being intoxicated at work. Dean told Flint not to warn the social worker in advance of the spot-check, but Flint disobeyed this order and warned the social worker. Dean found out that Flint had done so, but Flint denied it when Dean confronted him. Later, Flint confessed, and a letter of concern was placed in his file as punishment.
In the summer of 2014, Moussa Hamka became principal of GPSHS. Plaintiff had difficulties with certain changes instituted by Hamka, including transferring Plaintiff's secretary and requiring her to share Flint's secretary. Plaintiff was also dissatisfied with Hamka's reapportionment of work between her and Flint.
In December of 2014, Flint made some statements to Plaintiff about his evaluation of GPSHS media specialist C.M.[1] Although *604 Flint disputes her account of the incident, Plaintiff took the statements to mean that Flint was "trying to nail"-i.e. , be very harsh on-C.M. in his evaluation.[2] (R. 26-2, Plaintiff Depo., Page ID# 469-71.) Plaintiff told C.M. to "keep an eye on her evaluation." (Id. , Page ID# 471-72.) C.M. then discussed the matter with Hamka, and Hamka had Plaintiff write a statement about the incident. Plaintiff was told that she would be disciplined for telling a staff member about an ongoing review by another administrator.
After the incident with C.M., Plaintiff complained to Dean about Hamka's comments and conduct toward her. Dean understood this to be a complaint relating to gender discrimination and harassment, which Plaintiff elected to resolve through an informal process. As part of an informal investigation by Dean and Director of Secondary Education Maureen Bur, a meeting occurred between Dean, Bur, Hamka, and Plaintiff, wherein Hamka apologized for past comments and for making Plaintiff feel uncomfortable (but did not admit harassment). At this meeting, Plaintiff and Hamka "committed to work together in a collaborative, supportive fashion." (R. 20-12, 12/11/2014 Dean Email, Page ID# 330.) After their investigation, Dean and Bur concluded that no harassment had occurred. Plaintiff declined to pursue her complaint through a formal process.
Following this meeting and the resolution of Dean and Bur's investigation, Dean and Plaintiff met to discuss what Plaintiff had done wrong in warning C.M. about Flint's evaluation and what her punishment would be. Dean agreed to hold Plaintiff's discipline in abeyance, since he knew she was applying for administrative positions in other districts. Plaintiff took Dean's statement-that she would be disciplined "[u]nless [she] g[o]t another position by the end of the year"-as a threat suggesting that Dean wanted her to leave the district. (R. 26-2, Plaintiff Depo., Page ID# 519-20.) Dean also threatened to place a letter of suspension in Plaintiff's file.
In March of 2015, Plaintiff heard a rumor that Hamka and a teacher named L.L. had been in Hamka's office together after school hours. Plaintiff discussed the rumor with Flint. Flint confirmed that he and others were aware of the rumor. Around the same time, Dean and Bur independently heard rumors about Hamka and L.L. and visited GPSHS to investigate them. Upon finding out that Flint and Plaintiff were both aware of the rumor but had not come forward about it, Dean told the assistant principals that they had acted inappropriately. However, neither Plaintiff nor Flint received punishment immediately after the incident.
At her year-end evaluation, Plaintiff received a "minimally effective" rating for the 2014-2015 school year in her personnel file, but an "effective" rating was sent to the State of Michigan as a "placeholder" pending Plaintiff's job search. (R. 26-5, Dean Depo., Page ID# 732-33.) By contrast, Flint simply received an "effective" rating. Plaintiff was given a negative evaluation due to her conduct in warning C.M. about Flint's evaluation and in inappropriately handling the rumor regarding L.L. and Hamka. As a result of this review, Plaintiff received only a one-year contract instead of a two-year rolling contract. She was subject to termination if, at the end of the following school year, she did not receive an "effective" evaluation. She also became ineligible for any merit pay or step increases for which she might otherwise *605 have been eligible. Finally, Plaintiff was placed on an Individualized Development Plan ("IDP")[3] for the year following this "minimally effective" evaluation.
In June of 2015, Gary Niehaus became the district's superintendent. Niehaus decided to transfer Plaintiff to Parcells Middle School because of her gender complaint against Hamka and her warning to C.M. about Flint's evaluation.
At some point in summer of 2015, Dean asked Plaintiff to resign, and Plaintiff refused.
At Parcells Middle School, to which she was transferred, Plaintiff was paid at the lower rate for middle school assistant principals for two years. Niehaus claims this was in error, and Plaintiff was given backpay for the two-year period consistent with a high school assistant principal's salary.
Plaintiff took FMLA leave from November 17, 2015 to March 14, 2016 due to stress. Dean informed Plaintiff that because she had missed so much of the school year, she would not be able to receive a full year-end evaluation but would instead receive an "interim evaluation" for the 2016-2017 school year. (R. 26-21, 4/13/2016 Dean Email, Page ID# 856.) However, unbeknownst to Plaintiff, Niehaus later ordered that Plaintiff be given a full evaluation. Plaintiff received an "effective" rating on this evaluation, meaning she was once again given a two-year contract and taken off the IDP.
Procedural History
Plaintiff filed an EEOC charge in December of 2015 alleging gender discrimination and retaliation for her previously filed complaint of gender discrimination and harassment, and the EEOC issued a "right to sue" letter on August 17, 2016. Plaintiff filed suit against Defendant in the Eastern District of Michigan on November 15, 2016, alleging that Defendant 1) discriminated against Plaintiff due to her gender and sexually harassed her in violation of Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e et seq. ;[4] 2) retaliated against Plaintiff for engaging in protected activity in violation of Title VII; and 3) retaliated against Plaintiff for requesting and taking leave in violation of the Family and Medical Leave Act of 1993 ("FMLA"), 29 U.S.C. § 2601 et seq. Plaintiff amended her complaint to add allegations that Defendant 4) discriminated against Plaintiff due to her gender and sexually harassed her in violation of Michigan's Elliott-Larsen Civil Rights Act ("ELCRA"), Mich. Comp. Laws § 37.2101 et seq. ; and 5) retaliated against Plaintiff for engaging in protected activity in violation of the ELCRA.
After discovery, Defendant moved for summary judgment on all claims. The district court granted Defendant's motion, and Plaintiff timely appealed.
DISCUSSION
Plaintiff challenges the district court's order granting summary judgment for Defendant. Plaintiff argues that her claims of sex discrimination and retaliation in violation of Title VII (and analogous Michigan law) present genuine issues of material fact, as does her FMLA retaliation claim, and that summary judgment was therefore improper.
*606 All of Plaintiff's claims on appeal concern whether the district court erred in granting summary judgment, which we review de novo . Holloway v. Brush , 220 F.3d 767, 772 (6th Cir. 2000) (en banc). Summary judgment is proper where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The moving party bears the burden of proving that there is no such genuine issue. Celotex Corp. v. Catrett , 477 U.S. 317, 323, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). Whether a fact is "material" depends on whether its resolution might affect the outcome of the case. Anderson v. Liberty Lobby, Inc. , 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). In considering a summary judgment motion, this Court must "consider the evidence in the light most favorable to the non-moving parties, drawing all justifiable inferences in their favor." Payne v. Novartis Pharm. Corp. , 767 F.3d 526, 530 (6th Cir. 2014) (citing Anderson , 477 U.S. at 255, 106 S.Ct. 2505 ). "The ultimate question is whether the evidence presents a sufficient factual disagreement to require submission of the case to the jury, or whether the evidence is so one-sided that the moving parties should prevail as a matter of law." Id. (citing Anderson , 477 U.S. at 255, 106 S.Ct. 2505 ).
I. Title VII and ELCRA Gender Discrimination Claims
Plaintiff claims that Defendant violated Title VII and the ELCRA by discriminating against her on account of her gender. She claims this discrimination took the form of a transfer from GPSHS to Parcells Middle School, a "minimally effective" rating in her evaluation for the 2014-2015 school year, and other negative treatment.
Under Title VII's anti-discrimination provision, it is "an unlawful employment practice for an employer ... to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin." 42 U.S.C. § 2000e-2(a)(1). Under § 202 of the ELCRA, "[a]n employer shall not ... [f]ail or refuse to hire or recruit, discharge, or otherwise discriminate against an individual with respect to employment compensation, or a term, condition or privilege of employment, because of religion, race, color, national origin, age, sex, height, weight, or marital status." Mich. Comp. Laws § 37.2202(1)(a).
A plaintiff may show discrimination by direct evidence, or a plaintiff lacking direct evidence of discrimination may succeed on a Title VII claim by presenting indirect evidence under the framework first set forth in McDonnell Douglas Corp v. Green , 411 U.S. 792, 802-03, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973). See White v. Baxter Healthcare Corp. , 533 F.3d 381, 391 (6th Cir. 2008).
To succeed under the McDonnell Douglas framework, the plaintiff must first make out a prima facie case of discrimination by a preponderance of the evidence. Spees v. James Marine, Inc. , 617 F.3d 380, 389 (6th Cir. 2010). This Court "ha[s] held consistently that a plaintiff's burden of establishing a prima facie case is not an onerous one." Wheat v. Fifth Third Bank , 785 F.3d 230, 237 (6th Cir. 2015) ; accord Baxter Healthcare , 533 F.3d at 391 ("[T]he plaintiff bears the initial 'not onerous' burden of establishing a prima facie case of discrimination ...." (quoting Tex. Dep't of Cmty. Affairs v. Burdine , 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981) )). All a plaintiff must do is demonstrate that he 1) "is a member of a protected class;" 2) "was qualified for his job;" 3) "suffered an adverse employment decision;" and 4) "was replaced by a person *607 outside the protected class or treated differently than similarly situated non-protected employees." Baxter Healthcare , 533 F.3d at 391 (citation omitted). Once the plaintiff makes out a prima facie case, the burden shifts to the defendant "to articulate some legitimate, nondiscriminatory reason for" the adverse employment action. Id. at 397 n.9 (quoting Burdine , 450 U.S. at 253, 101 S.Ct. 1089 ). Should the defendant do so, the plaintiff then must prove by a preponderance of the evidence that the stated reasons were a pretext for discrimination. Id. at 391.
This framework also applies to discrimination claims brought under the ELCRA. Humenny v. Genex Corp. , 390 F.3d 901, 906 (6th Cir. 2004).
a. Plaintiff's Prima Facie Case
It is undisputed that Plaintiff was a woman who was qualified for a position as a high school assistant principal, satisfying the first two elements of her prima facie case.
Plaintiff argues that her transfer from GPSHS to Parcells Middle School and her "minimally effective" evaluation both independently satisfy the third element, which requires that a plaintiff show that she suffered an adverse employment decision. An adverse employment action is "a materially adverse change in the terms and conditions of [a plaintiff's] employment." Spees , 617 F.3d at 391 (quoting White v. Burlington N. & Santa Fe Ry. Co. , 364 F.3d 789, 795 (6th Cir. 2004) (en banc)).[5] The action must "constitute[ ] a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits." Baxter Healthcare , 533 F.3d at 402 (quoting Burlington Indus. v. Ellerth , 524 U.S. 742, 761, 118 S.Ct. 2257, 141 L.Ed.2d 633 (1998) ).
With respect to Plaintiff's transfer from GPSHS to Parcells Middle School, reassignments and position transfers "can qualify as adverse employment actions, particularly where they are accompanied by 'salary or work hour changes.' " Spees , 617 F.3d at 391 (quoting Kocsis v. Multi-Care Mgmt. , 97 F.3d 876, 885-86 (6th Cir. 1996) ). We also consider whether an action resulted in a plaintiff receiving "a less distinguished title, a material loss of *608 benefits, significantly diminished material responsibilities, or other indices that might be unique to a particular situation," along with other markers of prestige and desirability. Id. (quoting Kocsis , 97 F.3d at 886 ); accord Burlington N. & Santa Fe Ry. Co. , 364 F.3d at 803 (finding transfer was adverse employment action because, in part, "the [prior] position required more qualifications, which is an indication of prestige").
A middle school assistant principal receives a lower rate of pay than a high school assistant principal. Plaintiff was paid at this lower rate for two years after she was transferred to Parcells Middle School. While Plaintiff ultimately did receive backpay for these two years, this does not change the fact that she was transferred to a lower paying (and therefore less prestigious) position. Additionally, because no one would be aware that Plaintiff was ultimately paid at a higher rate than was standard for her position, Plaintiff's transfer outwardly appeared to result in a loss of both salary and prestige. Therefore, this transfer counts as an adverse employment action sufficient to satisfy the third element of her prima facie case.
With respect to Plaintiff's "minimally effective" evaluation, this Court has held that for a negative performance evaluation to count as an adverse employment action, "the plaintiff must point to a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." Baxter Healthcare , 533 F.3d at 402 (quoting Morris v. Oldham Cty. Fiscal Court , 201 F.3d 784, 789 (6th Cir. 2000) ).
Uncontradicted testimony established that Plaintiff received a "minimally effective" rating in her evaluation and that this was the rating "on record" in Plaintiff's personnel file for the relevant time period. (R. 26-5, Dean Depo., Page ID# 733-34.)[6] It was also established that Plaintiff would not receive a two-year rolling contract, as employees rated "effective" or higher do-but instead would receive only a one-year contract as a result of her "minimally effective" rating. (Id. , Page ID# 734.) Another result of her rating was that Plaintiff "would not be eligible for merit pay" or be able to receive a step increase for which she would otherwise be eligible. (Id. , Page ID# 734.) Finally, Plaintiff was required to undergo an IDP during the 2015-2016 school year and would have been terminated if she had not received an "effective" rating in her year-end evaluation that year. Because a "minimally effective" evaluation results in serious financial and professional consequences, Plaintiff easily shows "a tangible employment action that she alleges she suffered, or is in jeopardy of suffering, because of the downgraded evaluation." Baxter Healthcare , 533 F.3d at 402 (quoting Morris , 201 F.3d at 789 ). Plaintiff thus satisfies the third element of a prima facie case.
For the final requirement for a prima facie case as relevant to the instant claim, Plaintiff must show that she was "treated differently than similarly situated non-protected employees." Id. at 391 (citation omitted). Plaintiff identifies Flint as a comparator who satisfies this element. Flint was, like Plaintiff, an assistant principal at GPSHS.
*609 Like Plaintiff, Flint was questioned about why he did not come forward with information related to a possible relationship between Hamka and L.L. Unlike Plaintiff, Flint was never disciplined for the failure to report this information; he was not transferred and never received a rating lower than "effective" in an evaluation.
Like Plaintiff, Flint gave a coworker "the heads-up" about a potential negative employment consequence, in violation of Dean's clear directive that he was not to communicate with the coworker. (R. 26-3, Flint Depo., Page ID# 584-87; R. 26-2, Plaintiff Depo., Page ID# 469-71.) Flint informed the coworker that at a meeting the following day, the coworker would be "spot checked" for intoxication. (R. 26-3, Flint Depo., Page ID# 584.) Flint lied to Dean about providing advance warning to the coworker. Then-Superintendent Tom Harwood, in consultation with Dean and the Board of Education, imposed as punishment that Flint receive a letter of concern in his file (which was ultimately removed) and that the incident be mentioned in Flint's year-end review.
The district court erred in finding that Flint was "threatened ... with suspension" and put on an IDP. (R. 28, Opinion and Order, Page ID# 902.) Flint noted that "[t]here was talk of a suspension but that never took place," (R. 26-3, Flint Depo., Page ID# 588), which does not suggest the same imminence and seriousness as a threat of suspension. Further, Flint noted that his year-end evaluator was supposed to change as a result of this incident, but he was not sure this happened. Flint stated, "I guess I would call it an IDP, yes," (R. 20-4, Flint Depo., Page ID# 268); however, other than this uncertain statement, there was no evidence that Flint was subject to an IDP. Dean testified that Flint's punishment was "that a letter would be placed in Mr. Flint's file, that ... this event would be mentioned in his evaluation[,] [and that] Dr. Harwood ... [would] take over the review process for Mr. Flint for that year." (R. 26-5, Dean Depo., Page ID# 679.) Significantly, however, there was no threat of termination if Flint "d[id]n't achieve an effective on the following year['s] [evaluation]," which is an essential feature of an IDP. (Id. , Page ID# 735-36.) Unlike an IDP that carries with it the threat of termination, a change in evaluator is not alone an adverse employment action.
Plaintiff told C.M. to "keep an eye on her evaluation" because her evaluator (Flint) was "trying to nail"-i.e. , be very harsh on-her in the evaluation.[7] (R. 26-2, Plaintiff Depo., Page ID# 469-71.) Following her disclosure to C.M., Plaintiff was made to write a statement about the incident and was told she would be disciplined. Plaintiff never received a letter in her file because Dean agreed to hold any discipline in abeyance to help Plaintiff's job search. Plaintiff testified that Dean told her that she would be disciplined "[u]nless [she] g[o]t another position by the end of the year," and that she understood this as a threat, namely that Dean was saying, "I'll help you out [by keeping the discipline in abeyance], as long as you leave [the district] by the end of the year." (R. 26-2, Plaintiff Depo., Page ID# 519-20.) However, Plaintiff did not obtain another position, and no letter was actually written. Plaintiff also testified that she was threatened with disciplinary suspension in connection with this incident.
Further, Plaintiff testified that because of Plaintiff's role in the L.L. and C.M.
*610 incidents described above, Dean ultimately asked Plaintiff to resign or be transferred or terminated. By contrast, Flint was never asked to resign. After Plaintiff refused to resign, Niehaus transferred her to Parcells Middle School. Dean told Plaintiff that "he didn't see [her] [belonging] at South." (R. 26-2, Plaintiff Depo., Page ID# 550-51.) Although Plaintiff at one point agreed that no "formal discipline" was imposed for these incidents, (Id. , Page ID# 521), Defendant erroneously interprets this to mean that no discipline was imposed. (Appellee's Br. 18 (noting that "only Mr. Flint received discipline").) While Plaintiff may not have received a certain type of "formal discipline" like the placing of a letter in her file, her negative evaluation, being asked to resign, and transfer to Parcells Middle School were other forms of discipline with harsher consequences, which Flint avoided entirely.
Flint and Plaintiff are similarly situated as comparators. Plaintiff and Flint were subject to the same standards as Assistant Principals and engaged in similar conduct with no mitigating circumstances existing to excuse or lessen the culpability of Flint's conduct.
Defendant's principal argument to the contrary is this Court's statement that
to be deemed 'similarly-situated', the individuals with whom the plaintiff seeks to compare his/her treatment must have dealt with the same supervisor, have been subject to the same standards and have engaged in the same conduct without such differentiating or mitigating circumstances that would distinguish their conduct or the employer's treatment of them for it.
Mitchell v. Toledo Hosp. , 964 F.2d 577, 583 (6th Cir. 1992). Focusing on this language, Defendant argues that because Flint and Plaintiff were disciplined by different supervisors, they were not similarly situated.
However, this Court clarified soon after Mitchell that the requirements for finding a similarly situated comparator are not so onerous:
Courts should not assume, however, that the specific factors discussed in Mitchell are relevant factors in cases arising under different circumstances, but should make an independent determination as to the relevancy of a particular aspect of the plaintiff's employment status and that of the non-protected employee. The plaintiff need not demonstrate an exact correlation with the employee receiving more favorable treatment in order for the two to be considered "similarly-situated;" rather, as this court has held in Pierce, the plaintiff and the employee with whom the plaintiff seeks to compare himself or herself must be similar in "all of the relevant aspects."
Ercegovich v. Goodyear Tire & Rubber Co. , 154 F.3d 344, 352 (6th Cir. 1998) (emphasis in original) (quoting Pierce v. Commonwealth Life Ins. Co. , 40 F.3d 796, 802 (6th Cir. 1994) ). In particular, with respect to the "same supervisor" requirement that Defendant claims Mitchell recognized, this Court has clarified that "we have never read 'the "same supervisor" criterium' as an 'inflexible requirement.' " Bobo v. United Parcel Serv., Inc. , 665 F.3d 741, 751 (6th Cir. 2012) (quoting Seay v. Tenn. Valley Auth. , 339 F.3d 454, 479 (6th Cir. 2003) ). Rather, we have held that "a plaintiff claiming racial discrimination was similarly situated to a non-protected employee even though the two individuals 'worked in different ... departments and had different supervisors.' " McMillan v. Castro , 405 F.3d 405, 414 (6th Cir. 2005) (discussing and quoting Seay , 339 F.3d at 479 ). "Whether it is relevant in a particular case that employees dealt with the same supervisor depends on the facts presented." Bobo , 665 F.3d at 751. Importantly, we *611 have noted that the "same supervisor" requirement will be relaxed where a violation "does not occur frequently enough to invite such a direct comparison within a compartmentalized organization." Seay , 339 F.3d at 479-80. We have previously held that a plaintiff satisfied this element, despite being disciplined by a different supervisor than his comparator, where those who disciplined the plaintiff "were well-aware of the discipline meted out" to his comparator. Id. ; see also Louzon v. Ford Motor Co. , 718 F.3d 556, 564 (6th Cir. 2013) (holding that "whether a comparator was working for the same supervisor should not be given significant weight" if a defendant's general management structure would make it virtually impossible to find a comparator).
Plaintiff and Flint at all relevant times had the same immediate supervisor: Deputy Superintendent Dean. The record illustrates that Dean had the authority to discipline both Flint and Plaintiff. It is true that Flint's discipline was imposed by Harwood and Plaintiff's discipline was imposed by Dean (who gave her the "minimally effective" review and asked her to resign) and by Niehaus (who ultimately decided to transfer her). However, what is at issue in this case is Flint's lack of punishment. Because Dean had the authority to further discipline Flint but did not do so, there is an important sense in which Flint and Plaintiff did have the same supervisor. Dean himself identified the similarities between Plaintiff and Flint, testifying: "Both of them did not behave in an ethical or professional manner. Both of them violated the general accepted way that a business and organization runs and jeopardized the ... status or reputation of administration by doing something unethical." (R. 26-5, Dean Depo., Page ID# 683.) Yet based on the record evidence, Dean asked only Plaintiff-not Flint-to resign. Dean told Plaintiff that "he didn't see [her] [belonging] at South," (R. 26-2, Plaintiff Depo., Page ID# 550-51), but never made a similar statement to Flint.
Moreover, although it was Niehaus who ultimately made the decision to transfer Plaintiff, Niehaus consulted with Dean and based his decision on information that he learned from Dean. Harwood decided how to discipline Flint, but only did so after consulting with Dean. Thus, Dean was involved in all of the relevant employment decisions, even if he was not the final decisionmaker, and was certainly aware of the differences in Flint's and Plaintiff's discipline. See Seay , 339 F.3d at 480. Between this involvement and Dean's ability to further discipline Flint for his actions if he had chosen to do so, Dean was the common thread linking Flint's and Plaintiff's discipline, and he had a sufficiently central role in all of the relevant disciplinary decisions to render Plaintiff and Flint similarly situated.
b. Defendant's Explanation and Evidence of Pretext
Because Plaintiff is able to make out a prima facie case of discrimination (or, more specifically, has produced evidence creating a genuine issue of material fact on this issue), the burden shifts to Defendant to provide a nondiscriminatory explanation for treating Plaintiff and Flint differently. Baxter Healthcare , 533 F.3d at 391.
With respect to the different ratings, Dean explained that Plaintiff "behaved unethically" "at least three different times," whereas Flint did so only "once." (R. 26-5, Dean Depo., Page ID# 684.) Strangely, the district court found that "plaintiff received this rating because she made four poor decisions," (R. 28, Opinion and Order, Page ID# 906), despite Dean's specific testimony that she behaved wrongfully "[t]wice within the [C.M.] situation *612 and once within the [L.L.] situation." (R. 26-5, Dean Depo., Page ID# 684.) The district court was apparently interpreting Dean's later statement that Plaintiff's not reporting the L.L. and Hamka rumor and Plaintiff's discussion of the rumor with Flint were "separate violation[s]" to add a fourth. (Id. , Page ID# 717.) It is unclear from the record what Dean meant by these seemingly contradictory statements. One reasonable inference might be that Dean believed Plaintiff committed four violations; however, another reasonable inference (directly supported by Dean's testimony) is that he believed she only committed three. Given the posture of the case, it was error for the district court to draw the former inference, which favors Defendant, rather than the latter inference, which favors Plaintiff.
With respect to the transfer, Niehaus stated that his decision was due to Plaintiff's "gender complaint" and her warning C.M. about Flint's evaluation. (R. 20-7, Niehaus Depo., Page ID# 298.)
Plaintiff argues that Defendant's stated reasons for her transfer and her negative evaluation were pretextual because those resulted in punishments that were unreasonably harsh as compared with Flint's punishments for similar violations.
"[A] plaintiff can show pretext in three interrelated ways: (1) that the proffered reasons had no basis in fact, (2) that the proffered reasons did not actually motivate the employer's action, or (3) that they were insufficient to motivate the employer's action." Chen v. Dow Chem. Co. , 580 F.3d 394, 400 (6th Cir. 2009). "[A] plaintiff may also demonstrate pretext by offering evidence which challenges the reasonableness of the employer's decision 'to the extent that such an inquiry sheds light on whether the employer's proffered reason for the employment action was its actual motivation.' " Baxter Healthcare , 533 F.3d at 393 (quoting Wexler v. White's Fine Furniture, Inc. , 317 F.3d 564, 578 (6th Cir. 2003) (en banc)). To survive summary judgment, a plaintiff "must produce sufficient evidence from which a jury could reasonably reject [the defendant's] explanation of why it" took an adverse employment action against the plaintiff. Chen , 580 F.3d at 400. "At the summary judgment stage, the issue is whether the plaintiff has produced evidence from which a jury could reasonably doubt the employer's explanation. If so, her prima facie case is sufficient to support an inference of discrimination at trial." Id. at 400 n.4 (citing St. Mary's Honor Ctr. v. Hicks , 509 U.S. 502, 511, 113 S.Ct. 2742, 125 L.Ed.2d 407 (1993) ).
The record evidence creates a genuine issue of material fact as to whether Defendant's stated reasons were pretextual. Dean admitted that Flint not only tipped off a coworker, but also lied to Dean about it. Plaintiff's indiscretion in warning C.M. about Flint's evaluation was divided into two violations instead of one, but this division is inexplicable.[8] Unlike Plaintiff, Flint disobeyed Dean's direct order when he told his coworker about the spot-check for intoxication and lied to Dean about what he had done. This is at minimum two occasions of behaving unethically, and Dean admits that Flint behaved unethically a third time in not reporting the situation *613 with L.L. and Hamka. By contrast, Plaintiff disobeyed no direct order and admitted warning C.M. about Flint when confronted. Thus, Dean's explanation that Plaintiff "behaved unethically" "at least three different times," whereas Flint did so only "once," is one that a jury could reasonably reject. See Chen , 580 F.3d at 400. Dean testified that Plaintiff was "competent" and "hard working," and it is thus unclear why she received a "minimally effective" review while Flint received an "effective" review.
In sum, Plaintiff received a "minimally effective" review for tipping off a coworker about a negative evaluation. Despite similar conduct, Flint received an "effective" review. Dean asked Plaintiff to resign as a result of this and another indiscretion; Plaintiff was transferred as a result of these two indiscretions. Despite his similar indiscretions, Flint was never asked to resign or transferred. The explanations given for the difference in treatment suggest pretext, inasmuch as the explanations do not rationally explain the difference, and a jury could reasonably reject the stated reasons and find that the difference in treatment was instead motivated by gender discrimination.
We therefore reverse the district court judgment with respect to Plaintiff's Title VII and ELCRA gender discrimination claims.
II. Title VII and ELCRA Retaliation Claims
Plaintiff claims that her "minimally effective" evaluation and her transfer from GPSHS to Parcells Middle School constituted retaliation for her complaint about gender discrimination at GPSHS.
In addition to prohibiting discrimination, Title VII prohibits retaliation against an employee for engaging in conduct protected by Title VII. Laster v. City of Kalamazoo , 746 F.3d 714, 729 (6th Cir. 2014). Title VII's "opposition clause," which states that it is "unlawful ... for an employer to discriminate against any ... employe[e] ... because he has opposed any practice made ... unlawful ... by this subchapter," 42 U.S.C. § 2000e-3(a), has been interpreted to "protect[ ] not only the filing of formal discrimination charges with the EEOC, but also complaints to management and less formal protests of discriminatory employment practices," Laster , 746 F.3d at 730. Less formal protests that are still protected under Title VII include "complaints to human resources personnel regarding potential violations of Title VII." Id. (quoting Trujillo v. Henniges Auto. Sealing Sys. N. Am., Inc. , 495 F. App'x 651, 655 (6th Cir. 2012) ).
Like Title VII discrimination claims, Title VII retaliation claims may be proved with direct evidence or by indirect evidence via the McDonnell Douglas framework. Id. at 730. Under the latter approach, Plaintiff must first establish a prima facie case of retaliation by demonstrating four elements:
(1) [the plaintiff] engaged in activity protected by Title VII; (2) [the plaintiff's] exercise of such protected activity was known by the defendant; (3) thereafter, the defendant took an action that was "materially adverse" to the plaintiff; and (4) a causal connection existed between the protected activity and the materially adverse action.
Id. (quoting Jones v. Johanns , 264 F. App'x. 463, 466 (6th Cir. 2007) ). "If [Plaintiff] succeeds in making out the elements of a prima facie case of retaliation, the burden of production shifts [to the employer] to articulate a legitimate, non-retaliatory reason for the termination[ ]." Mansfield v. City of Murfreesboro , 706 F. App'x 231, 236 (6th Cir. 2017) (quoting *614 Evans v. Prof'l Transp., Inc. , 614 F. App'x 297, 300 (6th Cir. 2015) ). "If the [employer] satisfies its burden of production, the burden shifts back to [Plaintiff] to show that the reason was a pretext for retaliation. Although the burden of production shifts between the parties, the [Plaintiff] bear[s] the burden of persuasion through the process." Id. (quoting Evans , 614 F. App'x at 300 ).
The analysis of a retaliation claim brought under the ELCRA "is identical to the Title VII analysis." Kuhn v. Washtenaw Cty. , 709 F.3d 612, 627 (6th Cir. 2013) (quoting Wasek v. Arrow Energy Servs., Inc. , 682 F.3d 463, 472 (6th Cir. 2012) ).[9]
a. Plaintiff's Prima Facie Case
Plaintiff raised concerns to Dean about Hamka's comments and conduct toward her, which Dean understood as a harassment claim based on gender. Dean held a meeting related to Plaintiff's complaint, at the end of which Plaintiff and Hamka agreed that they could "work[ ] together and mov[e] forward." (R. 20-3, Dean Depo., Page ID# 252-53.) Dean informed Plaintiff that this completed the employer's informal complaint process and that she could pursue her complaint through the formal process if she desired. Plaintiff elected not to do so, and Dean sent an email to Plaintiff indicating that he found no gender discrimination or harassment.
Plaintiff's complaint to Dean was a "complaint[ ] to human resources personnel regarding potential violations of Title VII" and was thus sufficient to satisfy the first element of Plaintiff's prima facie case. Laster , 746 F.3d at 730 (quoting Trujillo , 495 F. App'x at 655 ). Because Dean identified Plaintiff's complaint as being a gender complaint, the second element is met as well.
With respect to the third element, to meet the requirement of demonstrating a materially adverse action, "a plaintiff must show that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Burlington N. & Santa Fe Ry. Co. v. White , 548 U.S. 53, 68, 126 S.Ct. 2405, 165 L.Ed.2d 345 (2006) (quoting Rochon v. Gonzales , 438 F.3d 1211, 1219 (D.C. Cir. 2006) ). Meeting this element is easier than meeting the adverse employment action element of a prima facie case of discrimination. Laster , 746 F.3d at 731 ; see Burlington N. & Santa Fe Ry. Co. , 548 U.S. at 69, 126 S.Ct. 2405 (identifying as a potential materially adverse action "excluding an employee from a weekly training lunch that contributes significantly to the employee's professional advancement"). As discussed above, Plaintiff made the harder showing required for her gender discrimination claim by producing evidence that she was asked to resign, given a "minimally effective" evaluation, and transferred to Parcells Middle School. Plaintiff therefore also satisfies the third element of her prima facie case.
Finally, Plaintiff must demonstrate causation between these materially adverse employment actions and her gender discrimination complaint. The Supreme Court has made clear that Title VII retaliation claims require traditional but-for causation, wherein a plaintiff must show " 'that the harm would not have occurred' in the absence of-that is, but *615 for-the defendant's conduct." Univ. of Tex. Sw. Med. Ctr. v. Nassar , 570 U.S. 338, 346-47, 133 S.Ct. 2517, 186 L.Ed.2d 503 (2013) (quoting Restatement of Torts § 431, Comment a (negligence)). Thus, a defendant will be entitled to summary judgment "[s]o long as [nondiscriminatory] factors were sufficient to justify [its] ultimate decision." Seoane-Vazquez v. Ohio State Univ. , 577 F. App'x 418, 428 (6th Cir. 2014).
Defendant emphasizes that Plaintiff admitted that her actions in warning C.M. about Flint's evaluation justified discipline, like a letter in her file (as Flint received). However, this does not indicate that giving Plaintiff a "minimally effective" review, asking her to resign, and transferring her to Parcells Middle School were justified by her admittedly blameworthy action of warning C.M. of Flint's evaluation, or by her conduct vis-à-vis Hamka and L.L.
This Court has held that "temporal proximity [between a Title VII complaint and an adverse employment action] alone can be enough" circumstantial evidence of causation if the two are sufficiently close in time. Montell v. Diversified Clinical Servs., Inc. , 757 F.3d 497, 505 (6th Cir. 2014). "[W]here some time elapses between when the employer learns of a protected activity and the subsequent adverse employment action, the employee must couple temporal proximity with other evidence of retaliatory conduct to establish causality." Id. (quoting Mickey v. Zeidler Tool & Die Co. , 516 F.3d 516, 525 (6th Cir. 2008) ).
Plaintiff argues that adverse employment actions began immediately after her complaint to Dean. Plaintiff argues that Dean's statement to her that he would hold her discipline in abeyance to help Plaintiff's job search constituted retaliation. Specifically, Plaintiff testified that Dean told her that she would be disciplined "[u]nless [she] g[o]t another position by the end of the year," and that she understood this promise of future discipline as a threat. (R. 26-2, Plaintiff Depo., Page ID# 519-20.) This interpretation of Dean's statements, considered alone, could be insufficient to meet the causation element.
However, it is not the only evidence. Plaintiff's complaint to Dean about Hamka occurred around eight months before Plaintiff received her "minimally effective" review. This is likely not a close enough temporal connection to meet the causation element absent other evidence. See Tuttle v. Metro. Gov't of Nashville , 474 F.3d 307, 320-21 (6th Cir. 2007) (finding that adverse employment action taking place roughly three months after filing EEOC charge was not sufficient on its own to establish causation). But it is the sort of temporal connection that can be "couple[d] ... with other evidence of retaliatory conduct to establish causality." Montell , 757 F.3d at 505 (quoting Mickey , 516 F.3d at 525 ).
In this case, other evidence is present: Niehaus testified that his decision to transfer Plaintiff was due to Plaintiff's "gender complaint" and her warning C.M. about Flint's evaluation. (R. 20-7, Niehaus Depo., Page ID# 298.)[10] Bizarrely, the district court held that "Niehaus testified that he transferred plaintiff to avoid staff conflict and because it appeared that South's atmosphere of trust was destroyed." (R. 28, Opinion and Order, Page ID# 915-16.)
*616 No such testimony exists in Niehaus' deposition. Of Niehaus' two stated reasons, the first explicitly demonstrates causation between the adverse employment action of transfer to Parcells Middle School and Plaintiff's gender complaint to Dean. As to the second, as discussed above, the fact that Flint engaged in equally (if not more) blameworthy conduct and was not transferred is evidence that the transfer was retaliatory. See Allen v. Mich. Dept. of Corr. , 165 F.3d 405, 413 (6th Cir. 1999) ("Although no one factor is dispositive in establishing a causal connection, evidence that the defendant treated the plaintiff differently from identically situated employees ... is relevant to causation."). Defendant has not clearly identified nondiscriminatory reasons "sufficient to justify [its] ultimate decision" to transfer Plaintiff. Seoane-Vazquez , 577 F. App'x at 428.
Between the temporal connection, Niehaus' identification of Plaintiff's complaint in justifying her transfer, and the different treatment of a similarly situated employee who did not engage in conduct protected by Title VII, a genuine issue of material fact exists as to whether there was a causal connection between the adverse employment actions against Plaintiff and her transfer.
b. Defendant's Explanation and Evidence of Pretext
Defendant's stated reasons for the adverse employment actions against Plaintiff are discussed in full in the previous section, as are the reasons why a genuine issue of material fact exists as to the pretextual nature of Defendant's explanations. In brief, because Defendant's stated reasons do not appear to justify the discipline taken against Plaintiff and because Plaintiff has "produce[d] sufficient evidence from which a jury could reasonably reject [Defendant's] explanation," Plaintiff has created a genuine issue of material fact as to whether Defendant's reasons were pretextual. Chen , 580 F.3d at 400.
We therefore reverse the district court judgment with respect to Plaintiff's Title VII and ELCRA retaliation claims.
III. FMLA Retaliation Claim
Plaintiff's final claim is that Defendant retaliated against her for taking FMLA leave.
The FMLA prohibits an employer from "discharg[ing] or in any other manner discriminat[ing] against any individual for opposing any practice made unlawful by this subchapter." 29 U.S.C. § 2615(a)(2). To establish a prima facie case of FMLA retaliation, Plaintiff must demonstrate:
(1) she was engaged in an activity protected by the FMLA; (2) the employer knew that she was exercising her rights under the FMLA; (3) after learning of the employee's exercise of FMLA rights, the employer took an employment action adverse to her; and (4) there was a causal connection between the protected FMLA activity and the adverse employment action.
Donald v. Sybra , 667 F.3d 757, 761 (6th Cir. 2012).
Plaintiff took FMLA leave from November 17, 2015 to March 14, 2016, and Defendant was aware that Plaintiff was taking FMLA leave.
However, Plaintiff cannot make out a prima facie case of FMLA retaliation because she cannot meet the third element of showing that Defendant took an adverse employment action against her. This Court has indicated that the standard for showing an adverse employment action is the same in the FMLA retaliation and Title VII retaliation contexts. Thus, to meet this element, "[P]laintiff must show *617 that a reasonable employee would have found the challenged action materially adverse, 'which in this context means it well might have dissuaded a reasonable worker from making or supporting a charge of discrimination.' " Burlington N. & Santa Fe Ry. Co. , 548 U.S. at 68, 126 S.Ct. 2405 (quoting Rochon , 438 F.3d at 1219 ).
This claim differs from the two above, in that Plaintiff's FMLA leave occurred after she received her "minimally effective" review, after Dean asked her to resign, and after her transfer to Parcells Middle School.
Plaintiff claims that she suffered adverse employment actions when she returned from FMLA leave and was told "that she would be given an interim rather than final evaluation for the 2015-[1]6 school year, kept on the IDP for another year and only be given another one-year contract instead of the rolling two-year contract that is given to all administrators." (Appellant's Br. 48-49.) However, Plaintiff has produced no evidence to rebut Defendant's evidence that Plaintiff in fact received a full evaluation, that she was not on the IDP for the 2016-2017 school year, and that she was placed back on a rolling two-year contract after she received an "effective" rating in her evaluation at the end of the 2015-2016 school year. We need not decide whether it is possible that giving an employee an interim rather than final evaluation might constitute an adverse employment action, because in this case no such thing occurred. Although Defendant admits that it "might not have clearly informed Plaintiff that Dr. Niehaus had directed that she be given a full evaluation," a temporary misunderstanding of what type of evaluation is to be given would not " ' "dissuade[ ] a reasonable worker from making or supporting [an FMLA claim]." ' " Burlington N. & Santa Fe Ry. Co. , 548 U.S. at 68, 126 S.Ct. 2405 (quoting Rochon , 438 F.3d at 1219 ). Thus, Plaintiff has not shown a genuine issue of material fact as to Defendant taking any adverse employment action against her after her FMLA leave, and her claim fails.
We therefore affirm the district court judgment with respect to Plaintiff's FMLA retaliation claim.
CONCLUSION
For the reasons stated above, the judgment of the district court is REVERSED with regard to Plaintiff's Title VII and ELCRA gender discrimination and retaliation claims, and the case is REMANDED to the district court with instructions to permit Plaintiff to present these claims to a jury; the judgment is AFFIRMED with regard to Plaintiff's FMLA retaliation claim.

This opinion will refer to this employee by her initials ("C.M.") and will do the same with another employee referred to as "L.L."

Flint denied saying this and testified that he only spoke with Plaintiff about the "rubric" involved in the review, not the review itself. (R. 26-3, Flint Depo., Page ID# 606.)

An IDP consists of setting goals and a plan to implement them, and "progress on those goals needs to be reflected" in the following year's final evaluation. (R. 26-5, Dean Depo., Page ID# 735.)

Plaintiff concurred in the dismissal of her sexual harassment claims in her Response to Defendant's Motion for Summary Judgment.

After identifying the third requirement to demonstrate a prima facie case, the district court cited a moment in Plaintiff's deposition where the court found she admitted that she "herself does not believe that her 'discipline' and 'demotion' were motivated by gender animus." (R. 28, Opinion and Order, Page ID# 912.) Plaintiff, after an aggressive line of questioning about "gender harassment by Dr. Dean and/or Maureen Bur," ultimately answered that she did not "think they were picking on [her] because [she] was a woman." (R. 20-2, Plaintiff Depo., Page ID# 234.) Defendant, on appeal, notes that because "Plaintiff made no sexual harassment claims against Dr. Dean and Ms. Bur," these "deposition questions ... were necessarily only related to [Plaintiff's] gender discrimination claims." (Appellee's Br. 26.) Yet it was Defendant's attorney who brought up Dean and Bur when asking about harassment. Plaintiff's statement that Dean and Bur did not sexually harass her is not an admission that they did not discriminate against her on the basis of gender. The fact that Defendant's attorney may have intended to ask about gender discrimination rather than sexual harassment is irrelevant. Summary judgment requires that this Court draw reasonable inferences in favor of Plaintiff. Instead, Defendant seems to want us to infer that a layperson read an attorney's mind and understood the potential legal significance of a confusingly formulated question. Elsewhere in her deposition, Plaintiff made clear that she believes she was discriminated against because of her gender. Drawing the reasonable inference for Plaintiff, Plaintiff has not admitted that her negative evaluation and transfer were not motivated by gender animus.

This was complicated by the fact that her rating was reported to the state of Michigan as "effective" as a "placeholder" for her eventual rating (R. 26-5, Dean Depo., Page ID# 732); however, in terms of negative consequences, those flowed from the rating in her personnel file, making what was reported to the state immaterial to this inquiry.

Flint denied saying this and testified that he only spoke with Plaintiff about the "rubric" involved in the review, not the review itself. (R. 26-3, Flint Depo., Page ID# 606.)

The district court found that Plaintiff talked to "among others, C.M." (R. 28, Opinion and Order, Page ID# 903); however, the court's citation to the record consists of Plaintiff testifying that she spoke to C.M. Dean obliquely mentioned that "[w]ithin the [C.M.] situation [Plaintiff] twice [ ] unprofessionally spoke to people about the evaluations." (R. 26-5, Dean Depo., Page ID# 684.) It is unclear from the record who else Plaintiff spoke to about C.M.'s evaluation.

Plaintiff argues that state law diverges from federal law as regards the causation issue. Michigan courts, however, have yet to address this issue, and this Court has persuasively explained why it is unlikely that Michigan courts would diverge from the federal interpretation. See Beard v. AAA of Mich. , 593 F. App'x 447, 452 (6th Cir. 2014).

This evidence could perhaps even be considered direct evidence of retaliation; however, because Plaintiff did not make such an assertion and Plaintiff's and Defendant's arguments pertain only to the indirect evidence framework, we will limit our analysis to that framework.